LESLIE HUGH JOYNER, JR. *v.* STATE
OF MARYLAND

[No. 23, September Term, 1969.]

*Decided October 3, 1969.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Leroy W. Carroll* (*Milton B. Allen* on brief) for appellant.

*James F. Truitt, Jr., Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City* and

*Fred K. Grant, Assistant State's Attorney for Baltimore City*, on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Twenty-eight indictments came on for trial in the Criminal Court of Baltimore under which the appellant was charged with offenses against the person and property of some eighteen women and a man. Upon trial by the court he was convicted of the rape (indictment no. 4990) and petit larceny of the goods (indictment no. 4991) of Barbara Ann Gregory; of the rape (indictment no. 4899) of Johnnie Mae Jones and the daytime breaking of her house with intent to steal (indictment no. 4997); of perverted sexual practice with (indictment no. 4998) and the armed robbery of Myrtle Brown (indictment no. 4902); of the armed robbery (indictment no. 4898) of Hattie Cockrell; of the rape (indictment no. 4901) of Gloria A. Lee and, in connection with that offense, of being a rogue and vagabond (indictment no. 4996). By the sentences imposed the appellant was to be imprisoned for the balance of his natural life plus thirty-five years.[1]

## THE IN-COURT IDENTIFICATIONS

The appellant contends that the judgments as to those crimes involving Gloria A. Lee, Hattie Cockrell and Myrtle Brown should be reversed because his pre-trial motion to exclude the in-court identifications of him as the criminal agent was not granted. The grounds for the motion were that a lineup at which he was confronted by the witnesses was illegal and that the witnesses had no independent source of their identification of him. The motion was not determined prior to trial. On the day of trial defense counsel brought the motion to the attention

---

1. At the close of the evidence offered by the State the court granted a mistrial "by the consent of all parties, and it will be without prejudice to the State or to the Defense" to sixteen of the indictments. It appears that three of the remaining twelve indictments were disposed of by verdicts of not guilty on motions for judgment of acquittal.

of the court with the suggestion that the matter be deferred for determination at the trial of the general issue. Although it appeared that the State desired that the issue be determined preliminarily, the court followed the suggestion of the defense. See Md. Rule 725d. As part of its case the State adduced the positive in-court identification of the appellant by Gloria Lee, Myrtle Brown and Hattie Cockrell, each of them asserting that the appellant was the perpetrator of the crimes against her. Geraldine McDowell also made a positive in-court identification of the appellant as the person who robbed Hattie Cockrell. The State offered no evidence of an extra-judicial identification of the appellant. See *Smith and Samuels v. State*, 6 Md. App. 59, 67-70. On cross-examination of Gloria Lee, Myrtle Brown, Hattie Cockrell and Geraldine McDowell, however, defense counsel elicited that each of them had attended a lineup at which she had identified the appellant. The defense offered two witnesses on the limited issue of the legality of the lineup—the appellant and Detective Sergeant George C. Shriner who conducted it. The substance of the appellant's testimony was that when the police informed him on the day he was arrested that he would be placed in a lineup about 2:00 P.M. that day he made abundantly clear to them that he desired the presence of his lawyer at the lineup. He telephoned Roland Walker, Esq.—"at this particular time he was supposed to be representing me"—and on being informed that Walker would be in court and could not attend at the time the lineup was scheduled, so informed the police who told him, "Well, you go in a lineup at 2:00. You are going in a lineup." The police called several people, informing them there would be a lineup at 2:00 P.M. The appellant called Walker again and was told, "You can't do nothing about it. (The police) will keep on insisting that you go. Just keep on insisting that you are not going to go in the lineup." He requested a postponement of the lineup because his lawyer could not be there and was told there would be no postponement, "The lineup was going on as scheduled." He kept insisting

that he did not want to appear in a lineup without a lawyer to the moment he was taken to the door of the lineup room when he was pushed in and told, "You are going in there." The lineup was held at 3:00 P.M. which the appellant said was about three hours after he was taken in custody. He did not sign a waiver of his right to counsel. On cross-examination he said he did not request another lawyer after he learned that Mr. Walker could not be present.

The police "lineup sheet" was introduced in evidence through Sergeant Shriner. It showed that the lineup was held at Detective Headquarters at 3:00 P.M. on 27 September 1967; that five men were in the lineup, giving their descriptions and describing their clothing; that twelve women had viewed the lineup; that nine of them, including Gloria Lee, Hattie Cockrell, Myrtle Brown and Geraldine McDowell, had made a positive identification of the appellant and the time each identification was made; and that the position of the appellant in the lineup had been changed after the appearance of the ninth witness. Shriner described the room in which the lineup was held and the manner in which it was conducted. On cross-examination it was elicited that he had advised the appellant as to his right to the presence of counsel at the lineup, reading from "a standard form, * * * that he may be represented by counsel, and if he did not have a counsel we would have one appointed for him. He stated to us that a Mr. Walker would represent him. * * * He called Mr. Walker. Mr. Walker was notified that he was going to be in a lineup at such-and-such a time. And this is what we indicated to him after reading the waiver to appear in a lineup. Mr. Walker was duly notified by us that his client would be in a lineup. He made the first call and at a later time a second call was placed to Mr. Walker. Mr. Walker also advised him." Shriner stated that counsel representing the appellant was not present at the lineup.

On this evidence the court denied the motion to exclude the in-court identifications, holding, as we construe its comments, that the lineup was legal.

*United States v. Wade,* 388 U. S. 218 affects the instant case as the lineup was held after 12 June 1967, *Stovall v. Denno,* 388 U. S. 293, and as its rules and those of *Gilbert v. State of California,* 388 U. S. 263, apply to a lineup conducted before indictment as well as after indictment. *Palmer v. State,* 5 Md. App. 691, 696. Thus the appellant had the absolute constitutional right to the presence of counsel at the lineup. We said in *Palmer,* at 693, "The basic principle enunciated in *Wade* is that a lineup is a critical stage of the prosecution at which the accused is as much entitled to aid of counsel as at the trial itself. 388 U. S. 236." [2] Of course, an accused may waive this right. It is stated in *Wade,* at 237, "Counsel's presence should have been a requisite to conduct of the lineup, absent an 'intelligent waiver'. See *Carnley v. Cochran,* 369 U. S. 506." *Carnley* made clear that when the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request. 369 U. S. at 513. The standard of proof of waiver of the right to counsel is that laid down in *Johnson v. Zerbst,* 304 U. S. 458, and the principles declared in *Johnson* are equally applicable to asserted waivers of the right to counsel in state criminal proceedings. 369 U. S. at 515. The Court said in *Johnson,* "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." 304 U. S. at 464. The right must be competently and intelligently waived. See *Adams v. United State ex rel. McCann,* 317 U. S. 269.

We have no difficulty here in finding that the evidence

2. Or as we said in *Tyler v. State,* 5 Md. App. 265, 272, the ultimate end of *Wade* is "that 'where so many variables and pitfalls exist, the first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification at the lineup itself' (388 U. S. at 235) by assuring the right to the presence of counsel at such pretrial confrontations to 'avert prejudice and assure a meaningful confrontation at trial' (388 U. S. at 236)."

before the lower court was not sufficient for it to determine that the appellant waived his right to counsel at the lineup. The police apparently proceeded under the theory that if the appellant was informed of his right to the presence of counsel and that if a lawyer desired by the appellant was notified that a lineup was to be held this was all that was required. But they knew that the appellant did not want to appear in the lineup without the presence of counsel and that the appellant could not obtain the presence of counsel at the lineup at the time it was scheduled. In the circumstances, their proceeding to conduct the lineup when they did was not in compliance with the *Wade* requirements. At the least, they should have postponed the lineup for a reasonable time to make possible the appearance of a lawyer for the appellant or, perhaps, if such postponement would in fact have been prejudicial to the State, provided a substitute counsel.[3] As the presence of counsel was a requisite to the conduct of the lineup, as counsel was not present when the lineup was conducted, and as the appellant did not waive his right to counsel, we hold that the confrontation at the lineup of the appellant by the identifying witnesses was illegal.[4]

*Wade* and *Gilbert* fashioned exclusionary rules as to evidence of identification made at an illegal confronta-

---

3. *Wade* left open the question whether the presence of substitute counsel might not suffice where notification and presence of the suspect's own counsel would result in prejudicial delay. 388 U. S. at 237. It noted, at 237, note 27:

"Although the right to counsel usually means a right to the suspect's own counsel, provision for substitute counsel may be justified on the ground that the substitute counsel's presence may eliminate the hazards which render the lineup a critical stage for the presence of the suspect's *own* counsel.

There was no evidence in the instant case that a postponement of the lineup to obtain counsel for the appellant would have been prejudicial to the State. That it may have been inconvenient to the police and to the witnesses who had been requested to appear would not amount to prejudice.

4. As we have decided that the lineup was illegal by the absence of counsel we do not reach, in our consideration of the conduct of the lineup, the contention of the appellant that it was otherwise illegal.

tion. We set them out in *Smith and Samuels v. State, supra,* at 65:

> "1) The in-court identifications of the accused by witnesses at such confrontation are to be excluded unless the prosecution established 'by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the confrontation identifications,' that is that they had an 'independent source.' *Wade* at 240 and 242.
> 2) Evidence that witnesses identified the accused at such confrontations is *per se* to be excluded. *Gilbert* at 272-274.
> 3) The admission of evidence, to be excluded under 1) and 2) is prejudicial error unless, in any event, its introduction was harmless error beyond a reasonable doubt, applying *Chapman v. State of California,* 386 U. S. 18. *Wade* at 242; *Gilbert* at 274."

Here the second rule is not applicable as evidence of identification at the lineup was not offered as a substantive part of the State's case. It was properly offered by the appellant on the issue of the admissibility of the in-court identifications. See *Smith, supra,* at 67-70. Nor is the third rule applicable, for if the in-court identifications were excludable, their admission would not be harmless error. It was only those identifications that proved the criminal agency of the appellant. The question is whether it was established "by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the (illegal) confrontation identifications," that is that they had an "independent source."

Mrs. Gloria A. Lee, employed by the Social Security Administration, separated from her husband, testified that she was raped by the appellant in her apartment about 9:30 A.M. on 6 July 1967. She was in bed, dressed only in a robe, when she heard a knock at her door. She

did not answer "because nobody knew I was home." A few minutes later she heard someone "bumping at the door like they were trying to get in." She went to the living room and saw the appellant standing there. She asked him what he wanted and he explained his presence by stating he had the wrong apartment and was looking for a man who owed him money. He started to leave and then turned and pointed a gun at her. He asked if anyone was there and went through the apartment with her "checking to see if anybody was home." He told her he wanted to have sexual intercourse with her. She begged him not to hurt her, "kill me or anything." He took her into the bedroom at gun point, took off his pants, stretched out on the bed and told her to get on top of him "so I wouldn't get pregnant." He had sexual intercourse with her. He then went to the bathroom "and I think he must have washed." He said he was not taking anything —"he started to take the record player but he changed his mind and he told me not to call the police." She had not seen the appellant before that time. Asked on cross-examination the duration of the act of intercourse, she said, "It could have been fifteen minutes. It could have been twenty. I don't know. It seemed like it was two days to me." It was apparent on both direct and cross-examination that she had a clear recollection of the circumstances surrounding the incident and each detail of the occurrence. She was not shown any photographs by the police. Asked if she looked at the other men in the lineup before she identified the appellant she said, "Not really. I didn't have to. He was the only—I remember when I first walked in the door. He stood out above all the rest of them."

Miss Myrtle Brown testified that about 3:40 A.M. on 10 August 1967 she parked her car in front of her apartment building at 4300 Liberty Heights Avenue, having just come from work at the Westinghouse Electric Corporation. She had a private entrance to her apartment and just as she got to the steps leading to the apartment the appellant jumped out from behind some

bushes. "He pulled out a gun and asked me for my pocketbook." She handed it to him. "This man then grabbed my arm and pulled me behind just in front of the building * * * He told me to pull my garment down. I told him I wasn't well and that made no difference to him at all. And he forced me to pull my garment down and he found I wasn't lying about that. He pulled his trousers down * * * He pulled his zipper down on his trousers and exposed himself and then he pointed the gun at me. And in the meantime I had tried to look at him. He slapped my face, I would say four or five times. And he told me not to look at him * * * He pulled—took his penis out of his pants * * * He forced me to accept his penis in my mouth * * * After the thing had been done he ran off." She was able to see his face. "There are lights under the balconies around the entire building which enabled anybody to be able to identify this man anytime." It was difficult for her to say how long she was in the presence of the appellant. "I would say at least, well, I would say at least five minutes, perhaps more. It did seem longer to me, really." She had never seen the appellant before that time. On cross-examination she said she had looked at the appellant and continued to look at him despite the threats. The incident occurred just in front of the building. "The lights are just over it." She identified the appellant at a lineup in which there were five men. He was number three. After her identification she remained in the room. She did not know how many witnesses came in after she identified the appellant. "I only know that I could identify him." She said she did not expect to see the man in the lineup. "I hoped to see him, yes. But I didn't expect to." The police did not tell her the man was in custody "because they didn't know who he was * * * I did."

Mrs Hattie Cockrell left her home to go to work at the Henryton State Hospital about 6:30 A.M. on 4 September 1967. She drove to work in the car of Mrs. Geraldine McDowell who picked her up at her home and on 4 September was waiting for her. As she crossed the street to

enter the car she saw the appellant. She had just gotten in the car when "the door flew open and the man stuck the knife in my chest and said, 'Okay, give me your pocketbook'. And I gave him my pocketbook and he ran. He ran back up the street to a car. He got in the car" which was headed in the same direction as Mrs. McDowell's car, backed up the street, turned around and went in the opposite direction. "I seen his face when I came out of the doorway and I noticed this man was looking across the street at me." On cross-examination she said it was not "fully daylight." When she came out of her house she saw the appellant. "The reason I looked at him is because he kept looking across the street when I came out and was about to walk in the walkway. He was looking over across the street at me. And then—that is how I—that is what made me come to look at him. Well, at that time he went past. He went down the street past the car." She saw him again in a lineup. She was shown photographs before the lineup but did not recall whether the photograph of the appellant was among them.

Mrs. Geraldine McDowell testified that she drove to Mrs. Cockrell's house to take her to work before 7:00 A.M. on 4 September 1967. She had to wait for her. Mrs. Cockrell came out, entered the car, sitting on the right front seat, and a man opened the door "and he put (a knife) in her chest and I—and I got out on the other side and ran across the street." She observed the man's face; she identified the appellant as the man. On cross-examination she said she had seen the man walking up and down the street when she was sitting in the car waiting for Mrs. Cockrell. "He was walking past the car * * * before she came out * * * He was walking up and down the street past the car." She said the man was dressed in a green banlon sweater and black trousers, had a heavy mustache and a lot of hair, was "around six something and weight * * * one hundred ninety, two hundred." [5]

---

5. A police department record, "Arrestee's Identification," introduced in evidence by the appellant, gave his weight as 226 pounds and his height as 69¼ inches.

She next saw him at a lineup and had not seen him since.

The test for determining whether the in-court identification had an independent source was set forth in *Wade* at 241:

> "We think it follows that the proper test to be applied in these situations is that quoted in *Wong Sun v. United States*, 371 U. S. 471, 488, 83 S. Ct. 407, 417, 9 L.Ed.2d 441, '[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. Maguire, Evidence of Guilt, 221 (1959).' See also *Hoffa v. United States*, 385 U. S. 293, 309, 87 S. Ct. 408, 17 L.Ed.2d 374. Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup."

We think that the evidence herein summarized was sufficient for the trial court to determine that the in-court identifications of Gloria A. Lee, Myrtle Brown, Hattie Cockrell and Geraldine McDowell were not come at by exploitation of the illegal lineup but by means sufficiently distinguishable to be purged of the primary taint. In so concluding we have considered the various factors referred to in *Wade* in applying the test. We believe that

each of the witnesses had ample opportunity to observe the criminal act so as to have the identity of the perpetrator impressed upon her memory. There was no showing of the existence of any discrepancy between any pre-lineup description given by the witnesses and the appellant's actual description. There was no evidence that any of the witnesses prior to the lineup had identified another person or that they failed to identify the appellant on a prior occasion. Although there was evidence that some of the witnesses had viewed photographs, the circumstances surrounding the viewing and the results of the viewing were not developed. The lapse of time between the alleged act and the lineup identification, as to Gloria A. Lee, was 2 months, 21 days; as to Myrtle Brown, 1 month, 17 days; as to Hattie Cockrell and Geraldine McDowell, 23 days. We do not deem these lapses of time to be significant in the circumstances. We have also considered those facts which, despite the absence of counsel, were disclosed concerning the conduct of the lineup. We see nothing improper with regard to the physical descriptions and dress of the four other men who appeared in the lineup, as compared with the physical description and dress of the appellant, as shown by the lineup sheet in evidence. There was no evidence sufficient to show that the police by word or deed improperly influenced the identifications at the lineup or that it was otherwise unfairly conducted. The appellant complains about the practice whereby each witness making a positive identification remained in the lineup room. He asserts, "The subsequent identifications by other witnesses could not help but reinforce the identifications made by those who preceded them." But no witness before making a positive identification was in the lineup room so as to observe another witness make an identification. Nor did the fact that the witnesses remained after they made their identifications so as to be present when other witnesses identified the appellant appear to have influenced the witnesses here in any way. On cross-examination Gloria Lee said she knew that witnesses

making an identification remained in the lineup room but she did not notice, when she was in the lineup room, any women she had previously seen while waiting her turn to enter the lineup room. After she made her identification she just sat there crying. Myrtle Brown, cross-examined on the point, said she did not know how many witnesses made an identification after she had identified the appellant. "I didn't keep track of how many came up, sir. * * * I don't know. I only know that I could identify him." Hattie Cockrell could not remember whether she stayed in the lineup room after identifying the appellant and did not know whether any others made an identification except Geraldine McDowell and even as to her she did not recall whether or not she was present when the identification was made by Mrs. McDowell. Geraldine McDowell said she did not see Hattie Cockrell in the lineup room and repeatedly said she did not remember whether or not she remained after she made her identification. Defense counsel elicited an affirmative answer to his question, "After you made your identification did you leave?" only after pressing her strongly on the point.[6]

We hold that there was clear and convincing evidence that the in-court identifications made by Gloria A. Lee, Myrtle Brown, Hattie Cockrell and Geraldine McDowell were based upon observations of the appellant other than the lineup identifications and that the lower court did not err in admitting them. Therefore, the judgments under indictments nos. 4901, 4996, 4898, 4998 and 4902 are not to be reversed on the ground that the lineup was illegal.

---

6. It may be a better practice that a witness not remain in the lineup room after he makes or fails to make an identification so that no identification or failure to make an identification occurs in the presence of another witness. Witnesses who have viewed the lineup should then more properly be separated also from those who have not yet viewed the lineup. Such a practice would obviate the claim here raised.

## THE IDENTIFICATION BY PHOTOGRAPHIC PROCEDURE

The appellant made a pre-trial motion to exclude an in-court identification by Barbara Ann Gregory on the ground that an extra-judicial photographic procedure by which she identified the appellant was impermissibly suggestive, tainting the in-court identification. Consideration of this motion was deferred for determination on the general issue. She made a positive in-court identification of the appellant as the man who raped her and stole her goods. No evidence as to an extra-judicial identification was adduced by the State in its direct examination of her. On cross-examination it was elicited that she had seen the appellant's photograph since the commission of the crime. On re-direct examination she said she had gone "downtown" but the appellant's photograph was not among those in the "photograph books" shown her. "Then some officers came to the house and they had some pictures * * * about six." She picked out the photograph of the appellant as being that of the man who raped her. No one had pointed it out to her or made a suggestion regarding it. On recross-examination she was not sure when the photographs were shown her but thought it was about two months after the crime which was committed on 4 July 1967. She did not know the names of the police officers who came to her home. They showed her about six photographs and asked her to look at them to see if any of them was of the man who raped her. She was handed the photographs, which were all the same size and she looked at each of them. The photograph of the appellant was among them. She thought it was "about the third" one she viewed. After she identified the photograph of the appellant one of the officers told her the appellant's name and that he had committed a number of rapes. It appears, although her testimony at this point is not clear, that before the police told her the name of the appellant and that he had committed other rapes, that she told the police that in the photograph the appellant had a beard but he had no

beard at the time of the attack and that an officer said, "It's been a long time and sometimes they grow them."

The State produced Officer John Coleman of the Baltimore City Police Department. He said that on 30 September 1967 he went to Mrs. Gregory's apartment and showed her some photographs. He asked her "to look through the group and see if she could pick out a photograph of the individual who was responsible for her offense, assault on her. At this point, before I handed the photographs, she appeared to be a little on the nervous side. I said we have a suspect and I said his photograph is in this group and we would like to see if you can identify him. And she said, 'What do you mean suspect?' I said, 'Well, we have a person arrested for similar offenses. I think he may be responsible for yours, and please look through the group of photographs and see if you can identify him.' " He showed her "fifteen— eighteen" photographs.[7] She picked out one which was in the middle of the pile. It was that of the appellant. Coleman was not cross-examined. The appellant adduced no evidence as to the circumstances surrounding the photographic identification.

The testimony of Mrs. Gregory as to her extrajudicial identification by photograph was not adduced by the State but by the appellant on cross-examination of her. He could properly do so and the testimony so elicited from her would go only to the admissibility of her challenged in-court identification, not to be considered by the trier of fact as substantive independent evidence of identity or corroborative of her in-court identification. The matter having been raised by the appellant, it was proper, as the trial was here conducted, for the State to adduce evidence thereon, again going only to the admissibility of the challenged in-court identification.[8] The

7. The officer produced the photographs he showed her at the trial. There were twenty-three in number.

8. For the admissibility of an extra-judicial identification as independent substantive evidence of identity or as corroborative of a judicial identification see *Smith and Samuels v. State, supra,* at 63-64.

rule, as enunciated in *Simmons v. United States,* 390 U. S. 377, 384, is "* * * that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

The lower court found on the evidence before it that the photographic identification procedure was not impermissibly suggestive and denied the motion to exclude the in-court identification. We cannot say that this judgment on the evidence was clearly erroneous. The only suggestions of impropriety in the procedure were that Coleman said that the photograph of a person arrested for similar offenses was included in the group of photographs she was to view, an officer's comment about the beard and the stating of the appellant's name after the identification and that he had committed other rapes. The court considered these matters in reaching its determination. We agree that they did not render the identification procedure, in the frame of reference in which they occurred, "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." That a police record indicated that Mrs. Gregory described her assailant as of "dark complexion" to the police shortly after the commission of the crime while he in fact was of "light complexion" (Mrs. Gregory denied that she had so described her assailant and the court found the report to be in error in this respect after hearing testimony on the subject) would in any event go to the weight of the in-court identification and not to its admissibility.

We note, even if the photographic identification procedure were found to be improper, the exclusionary rules of *Wade* and *Gilbert* would then apply. *Smith and Samuels v. State, supra,* at 67. Under those rules the in-court identification would be admissible if there was clear and convincing evidence that it was based upon observations

of the suspect other than the photographic identification. We have reviewed the testimony of Mrs. Gregory and, considering the factors set forth in *Wade* to be considered in applying the test, think that it was sufficient to establish that her in-court identification had an independent source and thus was properly admissible in any event.

We hold that the court did not err in its denial of the motion to exclude the in-court identification of Barbara Ann Gregory. Therefore the judgments under indictments nos. 4990 and 4991 are not to be reversed on the ground that the in-court identification was admitted in evidence.

## THE SUFFICIENCY OF THE EVIDENCE

The appellant questions the sufficiency of the evidence to sustain the convictions. He does not argue that the *corpus delicti* of each crime was not proved (it is clear that it was), urging only that the circumstances under which each victim viewed the perpetrator of the offenses against her precluded an identification. But each victim made a positive in-court identification of the appellant as the person who committed the offenses against her and as to the crime involving Hattie Cockrell, there was a positive in-court identification by an eyewitness. We have held that the in-court identifications by Gloria A. Lee, Myrtle Brown, Hattie Cockrell, Geraldine McDowell (the eyewitness to the crime against Hattie Cockrell) and Barbara Ann Gregory were properly admissible and the appellant did not contest the admissibility of the in-court identification by Johnnie Mae Jones on appeal. It is firmly established that the identification by a single eyewitness is sufficient to prove criminal agency. *Watson v. State,* 6 Md. App. 134. The matters which the appellant urges go only to the weight of the identifications, and are for the trier of fact. *Melia and Shelhorse v. State,* 5 Md. App. 354. As there was evidence sufficient to establish the *corpus delicti* of each crime of which the appellant was convicted and his criminal agency, the judg-

710

ment of the lower court on the evidence was not clearly erroneous. Md. Rule 1086.

*Judgments affirmed.*