STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN WALTER ROYSTER, DEFENDANT-APPELLANT.

Argued December 7, 1970—Decided February 11, 1971.

*Mrs. Susan T. Sinins,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Edward R. Rosen,* Assistant County Prosecutor, argued the cause for respondent (*Mr. Vincent P. Keuper,* Monmouth County Prosecutor, attorney; *Mr. Elliot L. Katz,* Assistant County Prosecutor, on the brief).

The opinion of the Court was delivered by

JACOBS, J. The defendant was convicted of murder in the first degree and was sentenced to death. He appealed to this Court as of right. *R.* 2:2–1(a)(3).

Mrs. Carmella Rapolla owned and operated a grocery store on Main Street in Matawan. She lived, with her twelve-year-

old daughter Marie and her seven-year-old son Joseph, in the rear and above the store. Her other son Daniel lived away from home at college. On the afternoon of January 10, 1968 Marie and Joseph returned home from school. They saw their mother and went into the living quarters. Marie went into the bathroom above the store where she began changing her clothes and washing up. Joseph was watching television when he heard a noise that sounded to him like three big firecrackers. He went into the store where he found his mother lying on the floor with blood coming from her mouth. She had been shot five times. Joseph ran to his sister Marie who, in turn, ran downstairs, saw her mother, and ran outside for help. On her way out she saw a man, whom she knew by sight but not by name, at the store's cash register. She later identified that man as the defendant. As she was running out of the store she passed another man. She testified that she did not look at that man and could not identify him. However, Herman Gatson testified that during the afternoon of January 10, he went to Rapolla's store for cigarettes, saw the defendant "messing around with the cash register," was told by the defendant to "get out the store," and as he left the store he was followed out by a little girl who was running and screaming and almost knocked him over.

The State presented many witnesses, in addition to Marie Rapolla and Herman Gatson, who placed the defendant in the Rapolla store shortly before and at the approximate time of the shooting of Mrs. Rapolla. In addition, there was substantial testimony with respect to the gun from which the five shots which killed Mrs. Rapolla were fired. The gun was a semi-automatic .22 caliber pistol which was received in evidence as part of the State's case. It was owned by a man known as Robert Thomas. He wanted to sell it and the defendant said to him "I think I have a sale for you." Thomas testified that he gave the gun to the defendant a few days before Mrs. Rapolla was shot and that two days after her shooting he received the gun back from Fred Reid. Reid

testified that he received the gun from the defendant during the day following the shooting of Mrs. Rapolla and that he returned the gun to Thomas during that evening. Wallace Armour testified that at about 1:30 P.M. of the day of the shooting he met the defendant who asked him whether he wanted to buy a gun.

The defendant testified on his own behalf and denied all knowledge of the gun. He admitted talking with Armour but denied that he had asked him whether he wanted to buy a gun. He acknowledged that Thomas and Reid were friends of his but disputed their testimony with respect to the gun. He admitted that he was in the Rapolla store on January 10 but placed the time earlier than did the other witnesses. He testified that he went into the Rapolla store to buy some cigarettes and that while there he "started messing with the cash register." He acknowledged that he saw Herman Gatson and "told him to get out the store." But he denied that he had a gun or that he had anything to do with the shooting of Mrs. Rapolla.

■ After the jury returned its verdict of guilty of murder in the first degree the defendant moved for a new trial asserting, *inter alia,* that the verdict was contrary to the weight of the evidence. The trial judge denied this motion and before us the defendant asserts that this constituted reversible error. He contends that "the jury could not reasonably have excluded the very real possibility that the murder was perpetrated by one or more of the State's witnesses" who were in the store "at the approximate time of the murder." We find no basis for this contention. Though no witness actually testified that he saw the defendant shoot Mrs. Rapolla, there was more than enough testimony from which the jury could properly infer that the defendant shot Mrs. Rapolla and could find beyond reasonable doubt that he was guilty of her murder in the first degree. The trial court could not fairly have concluded from the testimony before it, nor may we from the record before us, that "the verdict was the result of mistake, partiality, prejudice or passion" within

*R. R.* 1:5–3(a), or constituted "a manifest denial of justice under the law" within *R.* 2:10–1.

We come now to the various points of alleged trial errors which the defendant contends entitle him to relief on appeal. His first point attacks the in-court identification of the defendant by Marie Rapolla and by another State's witness, Marlene Longette. When Marie saw the defendant at the cash register she recognized him as a customer. She had seen him on many occasions and had waited on him. Indeed the defendant in his own testimony acknowledged that Marie had waited on him in her mother's store about a dozen times. Within a couple of days after the shooting, the police showed her gallery books which contained hundreds of photographs but none of the defendant. About three days after the shooting she was shown a photograph of the defendant and as soon as she saw it she said "that's the guy." Thereafter the defendant was placed under arrest. At the trial Marie made a firm identification of the defendant as the man she saw at the cash register.

 The identification procedure was neither unfair nor impermissibly suggestive. Marie knew the defendant, though not his name or address, and the sensible police course was taken in showing her gallery books which happened, however, not to include any photograph of the defendant. When the additional photograph was shown to her there were, according to the testimony, no accompanying suggestive comments and Marie's identification was immediate and spontaneous. The trial court correctly concluded that Marie's out-of-court identification was not improper and correctly permitted her in-court identification; indeed, the record before us dictates a finding that her in-court identification was independent of her prior out-of-court identification and was therefore in any event admissible. *See Joyner v. State,* 7 *Md. App.* 692, 257 *A.* 2d 444, 454 (1969); *cf. State v. Mustacchio,* 57 *N. J.* 265 (1970).

 Marlene Longette testified that during the afternoon of January 10 she went to Mrs. Rapolla's store and saw her

waiting on a man whom she identified as Mr. Siciliano, a State's witness during the trial. Marlene further testified that three persons, whom she could not identify, came into the store and that, as she turned around, she saw a fourth person behind her whom she identified at the trial as the defendant. She acknowledged that on January 19 the police had shown her three photographs including one of the defendant whom she then identified as the fourth person. She at that time had some difficulty making the identification because, as she testified, the defendant's photograph depicted him at an earlier age without his mustache and goatee and in different clothing. But at the trial she unequivocally identified the defendant and testified that her in-court identification was based on her view of the defendant in the store on January 10. The trial court, considering the totality of the circumstances (*Stovall v. Denno,* 388 *U. S.* 293, 302, 87 *S. Ct.* 1967, 18 *L. Ed.* 2d 1199, 1206 (1967); *Simmons v. United States,* 390 *U. S.* 377, 383, 88 *S. Ct.* 967, 19 *L. Ed.* 2d 1247, 1252–1253 (1968)), ruled that the out-of-court identification was made "under circumstances which precluded unfairness and unrealiability" (*State v. Matlack,* 49 *N. J.* 491, 498, *cert. denied,* 389 *U. S.* 1009, 88 *S. Ct.* 572, 19 *L. Ed.* 2d 606 (1967)) and that Marlene's in-court identification was admissible. We find no legal error in this ruling. Furthermore, Marlene's in-court identification is properly to be viewed as independent of her photographic identification and in any event as nonprejudicial. There was overwhelming testimony, including that of the defendant himself, establishing the fact that the defendant came into the store at the same time as the three other persons who, during the course of their testimony as State's witnesses, identified themselves as Clayborn Butts, Jr., Robert Miller and Junior Wilkins, all friends of the defendant.

■■ The defendant contends that under *United States v. Wade,* 388 *U. S.* 218, 87 *S. Ct.* 1926, 18 *L. Ed.* 2d 1149 (1967) counsel on his behalf should have been present at the out-of-court identifications by Marie and Marlene. He

did not raise this issue at the trial but now seeks to assert it on appeal as plain error. *R. R.* 4:63–2; *R. R.* 1:5–1; *R.* 1:7–5; *R.* 2:10–2. *Wade* was a case in which a defendant who had been indicted and had counsel was placed in a lineup for identification purposes without any notice to his counsel, Whether it is to be applied to pre-indictment cases need not be decided here. *See State v. Mustacchio, supra,* 57 *N. J.* at 269–270. Surely it has no application to Marie's out-of-court identification which occurred before there was any arrest or custody. And while Marlene's out-of-court identification occurred after the defendant was in custody, there was then no indictment or lineup and the identification was wholly photographic. The Supreme Court has not as yet held whether *Wade* applies to such photographic identifications and the State decisions are not uniform. *Compare People v. Stuller,* 10 *Cal. App.* 3d 582, 89 *Cal. Rptr.* 158, 168 (1970), *People v. Hawkins,* 7 *Cal. App.* 3d 117, 121–122, 86 *Cal. Rptr.* 428, 430 (1097), *Dorsey v. State,* 9 *Md. App.* 80, 262 *A.* 2d 591, 595 (1970), *Cook v. State,* 8 *Md. App.* 243, 259 *A.* 2d 326, 329 n. 2 (1969) and *Barnes v. State,* 5 *Md. App.* 144, 245 *A.* 2d 626, 630 (1968) *with Thompson v. State,* 451 *P.* 2d 704, 706–707 *(Nev.), cert. denied,* 396 *U. S.* 893, 90 *S. Ct.* 189, 24 *L. Ed.* 2d 170 (1969) and *Cox v. State,* 219 *So.* 2d 762, 765 *(Fla. App.* 1969). *See United States v. Zeiler,* 427 *F.* 2d 1305, 1307 (3 *Cir.* 1970) ; *Commonwealth v. Whiting,* 439 *Pa.* 205, 266 *A.* 2d 738, *cert. denied,* 400 *U. S.* 919, 91 *S. Ct.* 173, 27 *L. Ed.* 2d 159 (1970). However, we need not pursue the subject here in view of our earlier conclusion that Marlene's in-court identification was independent of her photographic identification and was, in any event, nonprejudicial.

■ The second point in the defendant's brief asserts that "the prosecutor's comments, testimony and publicity relating to defendant's financial circumstances deprived him of due process of law." We find no merit in this point. Local newspaper articles referred to the defendant as an unemployed laborer and noted that he was represented by the

Public Defender. Because of this the defendant moved during the selection of the jury for a mistrial, citing *State v. Mathis*, 47 *N. J.* 455, 471–472 (1966) where this Court condemned the projection of poverty as evidence of criminal predisposition. The trial court properly denied the motion, pointing out that the suggested prejudice could be weeded out through the *voir dire*. The prospective jurors were interrogated freely as to any reading on their part of the newspaper articles and we are entirely satisfied that the jury as carefully selected was not in anywise influenced by them.

During his original opening to the jury, counsel for the defendant stated that the defendant went into the Rapolla store on January 10 to buy cigarettes. Nealy, a witness for the State, testified that shortly before the shooting on January 10 he saw the defendant in a tavern near Rapolla's store and that at that time the defendant borrowed thirty-five cents from him to buy some pigs feet. The State offered this testimony as tending to negate the truth of the defendant's story, set forth in the opening and later in his own testimony, that he went to Rapolla's to make a purchase of cigarettes. The trial judge considered that the probative nature of the testimony outweighed any suggestion of prejudice (*cf.* Evidence Rule 4) and ruled that it was admissible; in doing so he did not exceed the proper bounds of his discretion which is necessarily recognized as a broad one in these evidential matters.

Wilkins, a witness for the State, testified on rebuttal that when he, Butts and Miller went into the Rapolla store, the defendant also came in and that when they left the defendant was standing outside the store. In the course of his testimony he stated that the defendant told him that he had "to get some money to pay off some tickets." No objection was made to this testimony and its admission did not constitute plain error. During the State's summation the prosecutor, in meeting the attack by defense counsel on the credibility of the State's witnesses including Nealy, pointed out that Nealy had two jobs in contrast to the defendant

who had no regular job. Considering all of the testimony in the record, it is inconceivable that the jury's verdict was prejudicially affected by this incidental comment in summation.

The defendant contends that he was denied due process in that "he was improperly precluded from presenting a complete defense." This has reference to a ruling by the trial court in connection with a proffer of testimony by Mr. George Walker as a witness for the defense. Mr. Walker would have testified that during the evening of January 9, the day before the shooting, he telephoned Mrs. Rapolla who told him, in a somewhat hysterical tone, not to come to the side door of the store which is occasionally used by certain customers. The trial judge considered that this testimony would not be relevant and that it might actually harm the defendant since the jury "might construe that he had caused some disturbance or some difficulty the day before or the night before." Its evidential value, if any, was thin and remote and the trial judge did not exceed his discretion in excluding it. *Cf.* Evidence Rule 4; *State v. Vojacek*, 49 *N. J. Super.* 429, 435 (*App. Div.* 1958). Realistically, the testimony could not have had any effect on the ultimate outcome of the case.

The defendant's final point relating to his conviction, apart from the death sentence, asserts that "the aggregation of legal errors demands the reversal of the defendant's conviction." *State v. Orecchio*, 16 *N. J.* 125, 129 (1954). Here the defendant has gathered various rulings for his concerted attack but, viewed either singly or in the aggregate, they in nowise impair the legality or justness of the jury's finding of guilt. The defendant complains about the testimony of the State's witness Davis. He was in the Rapolla store several weeks before the shooting and overheard a conversation between the defendant and Mrs. Rapolla. According to Davis' testimony, the defendant said he wanted a pint of wine and liverwurst on credit but she replied, "I can't let you have none"; the defendant then said, "The next time—

You going to have to let me have it next time." There was
no objection to the testimony at the time it was given but
the defendant now urges that its admission constituted plain
error. We do not so view it. Both premeditated and felony
murder were in the case (*State v. Mayberry, et al.,* 52 *N. J.*
413, 431–433 (1968), *cert. denied,* 393 *U. S.* 1043, 89 *S.
Ct.* 673, 21 *L. Ed.* 2d 593 (1969)) and the evidence had
some bearing on the defendant's motive and purpose in going
to the Rapolla store on the day of the shooting.

During the State's case a photograph showing the
body of Mrs. Rapolla was received in evidence. It was bare
from the groin up and showed the point of entrance of two
of the bullets which struck her. The defendant contends
that the trial court's admission of the photograph was im-
proper. However it did have probative value and was not
unduly inflammatory; its receipt in evidence was well within
the trial court's discretionary authority. *See State v. Conk-
lin,* 54 *N. J.* 540, 544–545 (1969); *see also State v. Coleman,*
46 *N. J.* 16, 26–27 (1965), *cert. denied,* 383 *U. S.* 950, 86
*S. Ct.* 1210, 16 *L. Ed.* 2d 212 (1966), where we noted that
"the admission of photographs having some probative value,
even where cumulative and somewhat inflammatory, rests
within the discretion of the trial judge, 'whose ruling will
not be overturned save for abuse, as where logical relevance
will unquestionably be overwhelmed by the inherently
prejudicial nature of the particular picture.' " *State v.
Smith,* 32 *N. J.* 501, 525 (1960), *cert. denied,* 364 *U. S.*
936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961).

The defendant is critical of the police investiga-
tion and contends that there was a "rush to judgment" re-
sulting in his conviction. He was precluded from showing
that the police failed to give polygraph (lie detector) tests
to State's witnesses who were in the store on the day of the
killing. The results of polygraph tests are still judicially
viewed as unreliable and therefore inadmissible in evidence.
*See State v. Driver,* 38 *N. J.* 255, 261 (1962); *State v. Cary,*
49 *N. J.* 343, 351 (1967), *s. c.,* 56 *N. J.* 16 (1970); *State v.*

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆ ▆▆▆▆

*Kavanaugh, et al.,* 52 *N. J.* 7, 15 n. 2, *cert. denied,* sub nom. *Matzner v. New Jersey,* 393 *U. S.* 924, 89 *S. Ct.* 254, 21 *L. Ed.* 2d 259 (1968); *but cf. Notes,* 4 *Suffolk L. Rev.* 111 (1969); 20 *S. C. L. Rev.* 805 (1968). While police officials may use them as investigatory aids their failure to do so has generally no evidential bearing in the trial's search for truth and justice. Evidence as to their omission may confuse the issues and mislead the jury; its exclusion here was not erroneous.

▆▆▆▆▆▆▆▆ The defense complains about several rebuttal witnesses, contending that their testimony should have been introduced on the State's direct case and that the names of some of them had not been furnished to the defendant in the course of pretrial discovery. Their testimony was properly received by the trial court as rebuttal. *See State v. Balles,* 47 *N. J.* 331, 343 (1966), *cert. denied, appeal dismissed,* 388 *U. S.* 461, 87 *S. Ct.* 2120, 18 *L. Ed.* 2d 1321 (1967). And we are satisfied that the defendant suffered no harm from the suggested deficiency in the pretrial discovery. The witnesses merely rebutted the defendant's testimony as to the precise hour when he was in the Rapolla store. Other testimony in the record overwhelmingly established that the defendant was in or about the store at approximately the time of the shooting.

▆▆▆▆▆▆▆▆ Before Joseph Rapolla testified, defense counsel unsuccessfully sought to interview him. The prosecutor states that Joseph's family had declined to permit the interview. Joseph's testimony concerned the discovery of his mother's condition and the summoning of his sister; he did not see anyone else in the store. Under the circumstances we find neither error nor prejudice. The defendant's closing item in his aggregation of alleged errors relates to the prosecutor's summation. The prosecutor first referred to *N. J. S. A.* 2A:113-4 which provides that every person convicted of murder in the first degree shall suffer death unless the jury shall by its verdict "recommend life imprisonment." He then discussed the death penalty and told the jury to inquire

whether "this man or this case has shown any circumstances" calling for a recommendation of life imprisonment. The defendant contends that this improperly shifted "the burden of proof with regard to this issue on the defendant." In context the prosecutor's remarks were not unfair nor did they in anywise shift the burden of proof.

█ The defendant's guilt was established by a full and fair trial and we find no reason for interfering with the jury's finding of guilt. We come now to the defendant's final points which are concerned, not with the finding of guilt, but with the death sentence. Thus he contends that New Jersey's statute unconstitutionally permits the jury to decide between life and death without appropriate standards after a unitary trial dealing with both guilt and punishment. His contention in this regard has been rejected by this Court (*State v. Forcella*, 52 *N. J.* 263, 287–290 (1968), *cert. dismissed*, 397 *U. S.* 959, 90 *S. Ct.* 999, 25 *L. Ed.* 2d 252 (1970)) although the issue is still pending in the Supreme Court and its determination may be awaited. Other contentions bearing on the constitutionality of the death penalty are raised by the defendant but they also may await Supreme Court determination. *See State v. Wilson*, 57 *N. J.* 39, 55 (1970); *State v. Sinclair*, 57 *N. J.* 56, 70 (1970); *State v. Artis*, 57 *N. J.* 24, 37 (1970). However, the record before us does present a clear violation of the principle set forth by the Supreme Court in *Witherspoon v. Illinois*, 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed.* 2d 776 (1968). Though that decision was handed down after the defendant's conviction, it was expressly made retrospective (391 *U. S.* at 523, 88 *S. Ct.* at 1777–1778, 20 *L. Ed.* 2d at 785 n. 22) and the violation calls for appropriate relief here. *See Maxwell v. Bishop*, 398 *U. S.* 262, 90 *S. Ct.* 1578, 26 *L. Ed.* 2d 221 (1970); *Boulden v. Holman*, 394 *U. S.* 478, 89 *S. Ct.* 1138, 22 *L. Ed.* 2d 433 (1969); *Bumper v. North Carolina*, 391 *U. S.* 543, 88 *S. Ct.* 1788, 20 *L. Ed.* 2d 797 (1968); *cf. State v. Sinclair, supra,* 57 *N. J.* 56; *State v. Wilson, supra,* 57 *N. J.*

39; *State v. Artis, supra,* 57 *N. J.* 24; *State v. Conforti,* 53 *N. J.* 239 (1969); *State v. Mathis,* 52 *N. J.* 238 (1968).

In *Witherspoon* the Supreme Court set aside a death sentence because prospective jurors had been excused for cause simply on their statement that they had conscientious scruples against or were opposed to capital punishment. In the course of his opinion, Justice Stewart noted that veniremen may properly be excluded for cause where they make it unmistakably clear "that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case" (391 *U. S.* at 522, 88 *S. Ct.* at 1777, 20 *L. Ed.* 2d at 785 n. 21); but he held for the Court that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 *U. S.* at 522, 88 *S. Ct.* at 1777, 20 *L. Ed.* 2d at 784–785. Such a jury was deemed by the Court to be constitutionally deficient as partial and unrepresentative on the issue of punishment as distinguished from guilt. 391 *U. S.* at 516–523, 88 *S. Ct.* at 1774–1777, 20 *L. Ed.* 2d at 782–786.

In *Boulden,* the defendant was convicted of murder and was sentenced to death in accordance with the jury's verdict. Later in a habeas corpus proceeding he raised the *Witherspoon* issue. The limited record indicated that eleven veniremen were excused for cause simply on the basis of their affirmative answer to the question of whether they had a fixed opinion against capital punishment. The Court expressed the view that the sentence of death could not constitutionally stand under *Witherspoon,* although it did not finally decide the question, preferring to remand it for a more complete record. *See also Maxwell v. Bishop, supra,* 398 *U. S.* 262, 90 *S. Ct.* 1578, 26 *L. Ed.* 2d 221. In his opinion for the Court Justice Stewart reaffirmed *Witherspoon* and pointed out that that case made it clear that "[u]nless a venireman states unambiguously that he would automatically vote against the

imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." After referring to the veniremen who were excluded from the jury in *Boulden* because of their statements that they did not believe in capital punishment, he made this comment: "Yet it is entirely possible that a person who has 'a fixed opinion against' or does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law — to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case." 394 *U. S.* at 483–484, 89 *S. Ct.* at 1141–1142, 22 *L. Ed.* 2d at 438–439.

In *State v. Mathis, supra,* 52 *N. J.* 238, this Court noted that our cases define cause in terms agreeable to *Witherspoon, i. e.,* "Mere opposition to the death penalty, whether it arises from a religious or conscientious scruple or any other source, does not constitute cause for challenge. Rather it must appear that the prospective juror is *unable* to return a death sentence no matter what may be the facts of the case." 52 *N. J.* at 244. In *Mathis* the trial court understood this controlling principle and sought to apply it by asking each prospective juror whether he was scrupled against capital punishment and, upon receiving an affirmative answer, by then asking whether the juror's view was so firm and fixed that he would be unable to return a death verdict in any case. The jurors who said they were so unable were excused for cause. 52 *N. J.* at 247.

The situation in *Mathis* may be contrasted with the situation in the case at hand where the record discloses that the trial judge did not understand and apply the *Witherspoon* principle but excused prospective jurors for cause simply on their statement that they were opposed to the death penalty. At one point he told a prospective juror that "some folks do have scruples" against capital punishment and "we excuse them for that." All told, twenty-five veniremen were automatically excluded when they indicated that they had

moral or religious scruples against or did not believe in capital punishment. Several illustrative instances will suffice. When venireman Van Note was asked by the court whether he had "any religious or moral scruples against the death penalty as such" he replied "I'm against capital punishment, yes." Without more the court said "You are excused." In response to a similar inquiry, venireman Cole replied "I don't believe in the death penalty" and without more was excused. The trial judge told venireman Clayton that what he wanted to know was "do you have anything in your mind about capital punishment." When he received the reply "I don't believe in capital punishment" he excused the venireman. The trial judge asked venireman Milne whether he had "any religious or moral scruples, feelings, objections or anything of that nature to the death penalty." The answer was "yes." The judge then said "You do. Allright. Mr. Milne, we thank you and you are excused."

Other illustrations might readily be set forth but enough has been said to disclose unmistakably that *Witherspoon* was not complied with and that consequently the death sentence fixed by the jury may not be permitted to stand. The remaining question is whether this Court should now modify the defendant's conviction by reducing the death sentence to life imprisonment as was done in *State v. Laws,* 51 *N. J.* 494, *cert. denied,* 393 *U. S.* 971, 89 *S. Ct.* 408 21 *L. Ed.* 2d 384 (1968), or should remand the case for further trial proceedings. At oral argument we inquired of both the prosecutor and the Public Defender whether, in the event we find that the sole error in the proceedings below related not to the guilt but to the sentence alone, they would urge new trial proceedings, or modification of the sentence as in *Laws.* The Public Defender has advised that the defendant would still urge that he "is entitled to a new trial as to both guilt and penalty." The prosecutor has advised as follows:

Re *State* v. *John Walter Royster*
 After a reading of the majority, concurring and dissenting opinions in *State* v. *Laws,* 50 *N. J.* 159 (1967) and *State* v. *Laws,* 51 *N. J.*

494 (1968), and a review of the potential problems which would arise on a retrial of the above captioned matter on the question of sentence, this office will waive the imposition of the death penalty, provided that it is found that error had been committed in selecting the jury in a manner which did not fulfill the requirements set forth in *Witherspoon* v. *Illinois*, 391 *U. S.* 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968) and *State* v. *Mathis*, 52 N. J. 238, 245 A. 2d 20 (1968).

In accord with the majority opinion in *State* v. *Laws, supra*, it is felt that the unavailability of witnesses who appeared at the first trial would make any retrial extremely difficult and as was pointed out in that decision, any attempt to read the prior testimony, in lieu of hearing live witnesses, would be unrealistic.

*Cf. Barber v. Page,* 390 *U. S.* 719, 88 *S. Ct.* 1318, 20 *L. Ed.* 2d 255 (1968).

The foregoing brings us foursquare within the holding in *State v. Laws, supra,* 51 *N. J.* 494 which we now follow and apply. *See* Note, "*State v. Laws*: Appellate Power to Reduce Jury-Determined Death Sentences," 23 *Rutgers L. Rev.* 490 (1969). In *Laws* the defendants were found guilty of murder in the first degree and were sentenced to death. On appeal, error was found bearing solely on their sentences and we were called upon to determine whether there should be a reversal with a new trial on guilt and punishment or on punishment alone, or a modification with a reduction of the death sentences to life imprisonment. As here, the defendants sought a new trial on both guilt and punishment while the prosecutor, in the light of our position that a separate penalty trial would be inappropriate (51 *N. J.* at 511–514; *cf. State v. Forcella, supra,* 52 *N. J.* at 289; 92 *N. J. L. J.* 333, col. 4 (1969)), waived the death penalty and urged that the sentences be modified to life imprisonment. 51 *N. J.* at 496–497. In a full opinion we held that the findings of guilt should stand and that the sentences of death should be reduced to life imprisonment. In view of the recency of the *Laws* opinion, no purpose would be served by a restatement of the supportive authorities and materials detailed there although its concluding paragraph does bear specific repetition here:

Judicial reluctance to exercise the general appellate modifying power where sentence is concerned has been attributed to long-

abandoned aspects of English criminal law which fortunately never had any counterparts in American criminal law. There is little basis for perpetuation of this reluctance, particularly in an enlightened State with a modern judicial structure such as ours. The delegates who drafted the 1947 Constitution deliberately vested this Court with sweeping judicial power to the end that it would be fully equipped to see that justice is soundly administered. Surely, if we are to keep their faith and match their vision, the power may not be found wanting here. The defendants were adjudged guilty of murder in the first degree on wholly sufficient evidence. They had a fair trial which was free from any prejudicial error relating to guilt. There was a sentencing error which may have brought about the death sentences but modification of the penalty to life imprisonment will now remove all possibility of harm from that error. Right and justice call for no greater relief to the defendants whereas the new trial they seek would be a clear imposition on society and might well bring about a gross miscarriage of justice. Under all of the circumstances including the prosecutor's waiver of the death penalty, we have no hesitancy in concluding that there is adequate appellate power to modify the judgments of conviction, as we now do, so that each of the defendants will stand convicted of murder in the first degree with sentence of life imprisonment. 51 *N. J.* at 514–515.

The conviction of the defendant John Walter Royster is affirmed insofar as it adjudged him guilty of murder in the first degree but the sentence of death imposed upon him is reduced to life imprisonment. To that end the judgment below is hereby:

Modified.

PROCTOR, J. (concurring). I agree with the result reached by the majority on all points. However, I wish to make it clear that I am concurring in the reduction of the death sentence to life imprisonment only because of the prosecutor's waiver of the death penalty. See my concurring opinion in *State v. Laws,* 51 *N. J.* 494, 515 (1968). Justice HANEMAN joins in this concurrence.

FRANCIS, J. (dissenting). Mrs. Carmella Rapolla owned and operated a neighborhood grocery store in Matawan, N. J. She was the widowed mother and sole support of three children. They lived in the rear of and above the store. Her

twelve year old daughter and seven year old son were at home with her; her older son was away at college.

On the afternoon of January 10, 1968, the defendant entered the store and killed Mrs. Rapolla by pumping five bullets into her body. In due course, the Monmouth County Prosecutor obtained a murder indictment against the defendant and when the case went to trial, in furtherance of his belief that his duty to the public required it, he sought the death penalty as punishment for the crime. After what the majority of this Court expressly found to be a full and fair trial of the issue of guilt, the jury found defendant guilty of murder in the first degree.

The jury had been told properly by the trial court that if they found guilt of first degree murder, they should turn to the problem of punishment. And the Legislature having dealt with the subject in mandatory terms, they were instructed in the language of the statute that such killers *"shall* suffer death *unless* the jury shall by its verdict, and as a part thereof, upon and after the consideration of all the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed." (Emphasis added.) *N. J. S. A.* 2A:113-4. Upon and after a consideration of all the evidence, the jury of Monmouth County citizens found no circumstances mitigating the heinousness of the murder, concluded that a death sentence was required, and declined to recommend life imprisonment. Accordingly, the trial court performed the duty concerning which the Legislature had left it no other choice and imposed a death sentence on the defendant.

Now, for the second time in a short period, the majority of this Court have interposed themselves between the jury and the Legislature and, in my view, thwarted their judgment and their will by reducing the death sentence to life imprisonment. See *State v. Laws,* 51 *N. J.* 494 (1968). As I noted in my dissent in *Laws,* in our tripartite system of government the power to prescribe the penalty for a crime (within constitutional limits) resides in the Legislature. That power

is an incident of the sovereign right of the State to maintain social order and to take life or liberty when deemed necessary in the interest of that order.

To repeat part of the dissent:

"There can be no doubt that if the statute [*N. J. S. A.* 2A.:113–4, *supra*] ended after the phrase 'shall suffer death,' that punishment would be mandatory. If the Legislature had not made provision for any other penalty, the judicial branch of the government would be bound by the mandate If on appeal from such a death sentence trial error appeared in the record, the authority of the appellate tribunal to rectify the error would be limited to an order for a new trial. Obviously a life imprisonment sentence could not be substituted for the death penalty. The Legislature, however, in adopting the statute in its present form, did establish a qualification — a single qualification — on its mandate compelling the death penalty for first degree murder. It is that the murderer shall suffer death unless the jury upon and after a consideration of all the evidence shall recommend life imprisonment. In my judgment, this qualification does not grant to the judiciary any greater authority than it had before the qualification was added. All the Legislature did, and in my view all it intended to do, was to give the jury the authority to lower the death penalty to life imprisonment if in *its* judgment — not the court's judgment, either trial or appellate — the evidence was such that clemency should be shown. On appeal from a death sentence, the authority of the court remained the same as before the qualification was added by the lawmakers. If trial error of any kind was shown, either on the guilt or innocence or penalty aspect of the case, which was prejudicial to the defendant's right to a fair trial according to law, there is not the slightest indication that the Legislature intended to empower the courts to substitute a life sentence for the death sentence which the jury verdict made mandatory. * * *" 51 *N. J.* at 519–520.

I consider the vacation of the death penalty in this case and its modification to life imprisonment (in reality, a sentence of 15 years or less) an invasion of the power granted by our Constitution to the legislative branch of the government. Assumption of such power constitutes a disregard of the basic separation of powers doctrine and sets in motion an erosion of our democratic form of government. To quote Montesquieu, "there is no liberty if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then

the legislator. Were it joined to the executive power, the judge might behave with violence and oppression." *Montesquieu, The Spirit of the Laws,* XXV, c. 2, quoted in *The Federalist* #78, p. 521 (Heritage Edition 1945).

The fundamental tenet of judicial review is that only the power of the Legislature, not the wisdom or policy of the legislation, is a fit subject for consideration. Judicially we must tolerate what personally we may regard as a legislative mistake. *Harisiades v. Shaughnessy,* 342 *U. S.* 580, 590, 72 *S. Ct.* 512, 96 *L. Ed.* 586, 599 (1952). We need not agree with a legislative judgment in order to obey a legislative command. Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the Legislature; or in other words, the will of the law. *Osborn v. Bank of United States,* 9 *Wheat.* 738, 866, 6 *L. Ed.* 204, 234 (1824).

The Legislature spoke clearly in *N. J. S. A.* 2A:113–4 as to the punishment for first degree murder. Whether or not we like the death penalty mandate laid down there, we do our system an injustice by frustrating the legislative will. If the death penalty no longer represents the public will, the legislators, who are responsible at the polls to the people, are entrusted by the Constitution with the decision to change it.[1] Reexamination of the majority opinion in *State v. Laws* has strengthened my view that the action of the majority in changing the death sentence in this case to life imprisonment is a usurpation of legislative power. Nor do I find any support for such a change in the suggestion that if we are to keep the faith and match the vision of the delegates to the 1947 Constitutional Convention, the power should be found. Such generalization finds no specific support in the minutes of the Convention. It seems obvious to me that no such vision, as has been made an actuality here, was ever on the Convention horizon. If it had been, I have little doubt

---

[1]See First Annual Message of Governor William T. Cahill to the Legislature, January 12, 1971 at 59–60.

that control of the punishment for first degree murder would have been left where it still remains, in the hands of the Legislature.[2]

I concur in that portion of the majority opinion which finds that the manner of selection of the trial jury transgressed the rule announced in *Witherspoon v. Illinois,* 391 *U. S.* 510, 89 *S. Ct.* 1770, 20 *L. Ed.* 2d 776 (1968). Since that error related to the matter of punishment alone, for the reasons expressed in the dissent in *State v. Laws, supra,* I would allow the part of the verdict relating to guilt to stand and would remand to the trial court for a retrial by a jury on the issue of punishment alone.

Justices PROCTOR and HANEMAN concurring in result.

*For affirmance and modification*— Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL, SCHETTINO and HANEMAN—6 .

*For affirmance and remandment*—Justice FRANCIS—1.

---

2Footnote 12 to the majority opinion in *Witherspoon v. Illinois,* 391 *U. S.* 510, 519, 88 *S. Ct.* 1770, 20 *L. Ed.* 2d 776, 783 (1968) points out that at the time of defendant's trial the Illinois statute made the jury's death penalty verdict binding upon the judge. In 1967 the Legislature by amendment to the statute empowered the court to reject the death verdict.