COMMONWEALTH vs. ROY MANGUM.

Suffolk.    December 1, 1969. — February 27, 1970.

Present: WILKINS, C.J., SPALDING, KIRK, SPIEGEL, & QUIRICO, JJ.

*Jury and Jurors. Practice, Criminal,* Capital case. *Constitutional Law,* Due process of law. *Homicide. Words,* "Malice."

At the trial of an indictment for murder in the first degree at which the defendant was convicted of murder in the second degree, there was no error in the exclusion from the jury, as not standing indifferent, of prospective jurors whose answers to questions by the judge indicated clearly and unequivocally that they had opinions on capital punishment which precluded them from reaching a verdict based on the evidence, or of a prospective juror who could not or would not state that she had no opinion which would preclude her from reaching such a verdict [79]; the exclusions were not shown to have resulted in a jury which denied the defendant due process of law [80].

Circumstantial evidence at a murder trial warranted findings that the defendant, while in his apartment, intentionally inflicted a vaginal

wound on the victim other than in the course of normal sexual activity, that she bled to death from the wound, and that, in the absence of any evidence of any justification, excuse, palliation or mitigation for such act, the defendant acted maliciously and was guilty of murder in the second degree. [85–86]

INDICTMENT found and returned in the Superior Court on April 7, 1967.

The case was tried before *Hudson*, J.

*Albert L. Hutton, Jr.*, for the defendant.

*John T. Gaffney*, Assistant District Attorney, for the Commonwealth.

QUIRICO, J. The defendant was tried on an indictment charging him with the crime of murder in the first degree. The jury found him guilty of murder in the second degree, and the mandatory punishment of "imprisonment in the state prison for life" was imposed on him. G. L. c. 265, § 2. The case was tried subject to G. L. c. 278, §§ 33A–33G, and it is here on the defendant's appeal.

The case is before us on the alleged errors by the trial judge in (1) excusing ten prospective jurors after questioning them and deciding that they did not stand indifferent; and (2) denying two motions by the defendant for directed verdicts of not guilty, one filed after both sides had rested, and the other within five days after verdict as permitted by G. L. c. 278, § 11. Other errors previously assigned were expressly waived and we do not deal with them.

The ten prospective jurors who the defendant alleges were improperly excused were questioned on oath by the trial judge along the following lines:

(a) Each was asked the questions prescribed by G. L. c. 234, § 28, to determine "whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein." The statute concludes that "If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead." It has been the practice in this Commonwealth for many years to put these questions to jurors in capital cases.

(b) Each was asked whether he had any opinion which would prevent or preclude him from finding a defendant guilty of a crime punishable by death, if the juror should be convinced by evidence beyond a reasonable doubt that the defendant was guilty of such a crime. This type of question is required for compliance with G. L. c. 278, § 3, which provides that persons who have such opinions "shall not serve as a juror on the trial of an indictment for such crime."

(c) Each was asked whether he had any opinion which would prevent or preclude him from recommending life imprisonment for a defendant found guilty of first degree murder. This type of question is appropriate in view of the provision of G. L. c. 265, § 2, as amended by St. 1951, c. 203, that "[w]hoever is guilty of murder in the first degree shall suffer the punishment of death, unless the jury shall . . . recommend that the sentence of death be not imposed, in which case he shall be punished by imprisonment in the state prison for life." It has been the practice to put this type of question to prospective jurors in capital cases in this Commonwealth, at least since this court suggested in *Commonwealth* v. *Ladetto,* 349 Mass. 237, 245, that it would be "a wise exercise of discretion" to do so. See *Commonwealth* v. *Nassar,* 354 Mass. 249, 255.

The defendant contends that the trial judge found the ten prospective jurors not indifferent and excused them for the sole reason that they had views or opinions against capital punishment. A careful reading of the transcript does not support this contention. It shows a thorough interrogation by an experienced judge engaged in an effort to seat impartial jurors who could hear the evidence with an open mind and then deliberate and arrive at a verdict uninfluenced by any personal views or opinions for or against punishment by death or by imprisonment for life. In no instance was a prospective juror declared not indifferent and excused solely because of views or opinions on the matter of punishment. Nine of the ten jurors in question gave answers which indicated clearly and unequivocally that they had opinions which precluded them from reaching a

verdict based on the evidence and the law applicable thereto. No purpose would be served in reviewing the questions put to them and their answers thereto.

The defendant's brief treats specifically with the questions put to the tenth juror on the matter of capital punishment and her answers thereto.[1] Her answers are by no means typical of those of the other nine. She was either unable or unwilling to state, and in any event she did not state, that she had no opinion which would preclude her from finding a defendant guilty of a crime punishable by death if convinced by the evidence beyond a reasonable doubt that he was guilty. The trial judge properly decided that she was not indifferent and excused her. The impartiality or indifference of a prospective juror under interrogation is an attribute which must appear affirmatively. If the juror is unable or unwilling to say whether he could or could not judge the case on its merits, he should not be allowed to serve. *Ladetto* v. *Commonwealth,* 356 Mass. 541, 546. *State* v. *Mathis,* 52 N. J. 238, 248.

Since there was no exclusion of prospective jurors solely because they were opposed to capital punishment, this case does not come within the constitutional rule of *Witherspoon* v. *Illinois,* 391 U. S. 510. Even if the exclusions had been for that reason, the rule of that case would not apply, because by its terms, and by the limitations imposed by *Bumper* v. *North Carolina,* 391 U. S. 543, 545, it applies only to cases where the death penalty was imposed. It has been similarly limited in several of our decisions. *Commonwealth* v. *Nassar,* 354 Mass. 249, 257. *Commonwealth* v.

---

[1] Q. "If you should be sworn as a juror in a case where the penalty might be death and should be convinced by the evidence beyond a reasonable doubt of the guilt of the defendant, have you an opinion which would preclude you from doing your sworn duty of finding the defendant guilty?" A. "Well, that's 50–50 — I'm undecided in my mind — I don't really believe in capital punishment —" Q. "I can understand your right to that belief, but assuming that it was the law of the Commonwealth that a person may be put to death if found guilty of murder in the first degree, is your feeling so firm or so inflexible that if you were satisfied upon all the evidence beyond a reasonable doubt that the defendant was guilty, that you would not vote for conviction?" A. "I don't I would. I don't believe in that law — capital punishment —."

*Sullivan,* 354 Mass. 598, 608. *Commonwealth* v. *Francis,*
355 Mass. 108, 111. *Commonwealth* v. *Carita,* 356 Mass. 132,
143–144. *Commonwealth* v. *Connolly,* 356 Mass. 617, 622.

The defendant advances the further argument in his brief
that even though the constitutional rule of the *Witherspoon*
case may not apply, "a death-oriented jury such as was
condemned by . . . [the *Witherspoon* case] insofar as the
imposition of the death penalty is concerned and such as the
defendant was stuck with in this case, is not the kind of
fair and impartial jury of his peers by which he is entitled
to have been tried under the Constitution of the United
States and the Constitution of the Commonwealth of Massa-
chusetts." This argument, although not further developed
in the brief, sounds like a contention that the defendant was
denied his constitutional rights to due process of law or
equal protection of law under the Fourteenth Amendment of
the United States Constitution, or that he was denied the
benefit of the law of the land under art. 12 of the Declaration
of Rights of Massachusetts. This argument does not apply
to this case. The ten jurors in question were excluded be-
cause they did not stand indifferent, not because they had
views or opinions for or against particular kinds of punish-
ment. Neither party has the right to insist that such per-
sons be allowed to serve as jurors. If this were a case where
jurors had been excluded solely because of such opinions on
punishment, the defendant would have the burden of show-
ing that the exclusion resulted in his being tried by a jury
who were more likely to convict, or more "prosecution-
prone" than a jury from whom such persons were not
excluded. This is not such a case; and the defendant has
made no such showing. For this additional reason, he
cannot prevail on this contention. See *Witherspoon* v.
*Illinois,* 391 U. S. 510, 516–518; *Bumper* v. *North Carolina,*
391 U. S. 543, 545; *Commonwealth* v. *Connolly,* 356 Mass.
617, 622–623. In the *Connolly* case, which was decided after
the present case was argued, the defendants advanced this
same constitutional argument. What we said there on this
issue on January 28, 1970, applies to this case.

We now consider the allegations of error in the denial of the defendant's two motions for directed verdicts of not guilty. No additional evidence was presented after the denial of the first such motion. Thus both motions present the same question of the sufficiency of the Commonwealth's evidence to warrant the jury in returning a verdict of guilty of murder in the second degree. We summarize the evidence.

For about a year prior to her death on March 9, 1967, Mary Prisinzano (the deceased) who was thirty-six years of age lived in a second floor five room apartment at 4 Willis Terrace, in the Roxbury section of Boston, with her three sons and a daughter. The landlord was Edward Matlin who lived in the first floor apartment of the same building until he moved to California in December, 1966. When he moved he left his Chevrolet station wagon and the keys to it and to his apartment with the deceased. Shortly thereafter the defendant with two ladies (one called "Lou" and the other "Roberta") and five children moved into the first floor apartment.

The occupants of the first and second floor apartments visited in each of the apartments almost daily. Some of them played cards together, and engaged in drinking in the defendant's apartment on occasions. The defendant borrowed money from the deceased on many occasions. The deceased allowed the defendant to use the landlord's station wagon about three to five times a week.

About 3:30 P.M. on March 8, 1967, when the deceased's daughter Kathy, then about fifteen years old, was returning home from school, she saw the defendant seated with Lou and Roberta in a car across the street from her home. When she entered the first floor hallway of the building she saw that the only door leading from the hall to the defendant's first floor apartment was closed and padlocked. There was another door from the hall to that apartment, but it had been boarded up and could not be used. There was no one in that apartment on that afternoon and in the evening except the defendant and the deceased as will appear later in this summary.

On that evening Kathy went to bed about 9:30 P.M., and her three brothers went to bed about 10:45 P.M., leaving the deceased alone in the parlor watching the television. Before going to bed the deceased's son John, then about seventeen years old, looked out the window and saw the landlord's station wagon parked in its usual place next to the house.

About 1:30 A.M. on March 9, 1967, Kathy heard the defendant knocking at the second floor apartment door and calling loudly: "Mary, come downstairs. Lou wants you." Kathy opened the door and the defendant entered the parlor. He repeated the statement to the deceased who had been lying down on the couch. He then went down to his apartment and the deceased started to lie down again. In about two minutes the defendant called from downstairs: "Mary, come downstairs. Lou wants you. Are you coming?" The deceased got up and went downstairs dressed only in a blue bathrobe. There was nothing physically wrong with her at that time. She was gone from her apartment about ten to fifteen minutes. During that period both Kathy and John were awake, and they heard no noise from the first floor.

When the deceased returned to her apartment she went to Kathy's room and said to her: "Help me, I'm bleeding." She did not mention the defendant's name. She had "a lot of blood" coming from underneath her bathrobe and pouring down. It was all over her feet. There was also blood on the back of the bathrobe at about the base of her buttocks. Kathy ran downstairs to get help, but she found the door of the first floor apartment padlocked from the outside. She ran to the front door of the building and yelled in a loud voice: "Help me, My mother is bleeding." When she yelled she saw the defendant about fifteen feet away. He was running or hurrying away, and he did not come back. There was no evidence that he or any other person was in the first floor apartment at any time after that. She then returned upstairs and called to her brother John to get up. John got up, looked out the window, and saw that the landlord's station wagon was gone.

Kathy then called a neighbor, Mrs. Beverly Comiskey, by telephone. After the deceased returned from the first floor apartment in a bleeding condition, she got in bed and remained there except for two short periods. Shortly after returning she went from her bedroom to the bathroom. Kathy, who was with her, saw that she was bleeding, and she saw something come out of her, but she does not know what it was.[2] Mrs. Comiskey arrived shortly thereafter. The deceased tried to go to the bathroom, but she could not make it. She fell in the hallway, and was helped back to bed.

The police were then called by Kathy. After arriving they called a doctor who did not come to the home. Mrs. Comiskey talked to the doctor by telephone. As a result of that talk she rendered some aid suggested by the doctor, including cold packs of wet towels which the deceased applied to her private parts. The deceased continued to bleed. She said nothing to Mrs. Comiskey about having gone downstairs. The persons present tried to have the deceased go to a hospital. The police were prepared to take her to a hospital, but she refused to go. She said she would see her doctor in the morning. The police remained for about an hour and a half. About 5:30 A.M. the deceased was lying in bed, alive and conscious. She indicated she wanted to sleep, so Mrs. Comiskey left to return home. About 9:30 A.M. Kathy tried to awaken her mother and found her dead.

About 3:30 P.M. on March 9, 1967, the police found the front hall entrance to the defendant's apartment padlocked from the outside. They obtained a key from one of the deceased's children and entered. There was no one in the apartment. They found a "trail of reddish brown stains," later analysed and found to be human blood, starting in the apartment, leading out into the hall, continuing to the stairs and up the stairs to the second floor into the deceased's

---

[2] The defendant argues that this might indicate a miscarriage with accompanying hemorrhage. However, the medical examiner testified that because of certain physical conditions of long duration, the deceased "could not become pregnant." The witness Comiskey testified that the deceased made a similar statement to her after her injury and before her death.

apartment. Stains of human blood were also found on the following articles taken from the defendant's apartment about 5:30 P.M. on the same day: two blankets, a bed sheet, and two pairs of men's shorts. The shorts were found entangled with each other. Laboratory tests showed that (a) both pairs of shorts bore stains in the front or fly area, the stains on each pair being of approximately the same size, shape and location; and (b) the blood residue was heavier on the outside of each pair than on the inside, indicating that it had diffused from the outside to the inside. A face cloth with stains of human blood on it was found in the hallway outside the door of the defendant's apartment. There were no bloodstains on the stairs, on the floors of the hallway, or the deceased's apartment before she went down to the defendant's apartment in response to his call in the early morning hours of March 9, 1967. The jury took a view of the premises, but could not go in the building because of recent fire damage.

Dr. Richard Ford, the medical examiner for Suffolk County, performed an autopsy on the deceased in the afternoon of the day she died. He found her to be sixty-six inches tall, and to weigh about 110 pounds. Her blood alcohol was 0.40% which he described as "a high level." He testified in part that "she had multiple old and recent bruises about the body surface. . . . Internally, there was liquid blood in the vagina, which originated in a two inch laceration, a tear of the upper end or vault of the vagina, on the right side — the right side of the cervix, of the uterus or womb. This laceration extended upward alongside the upper portion of the cervix of the womb and of the body. It did not enter the peritoneal or belly cavity." He expressed opinions (a) that death was due to "exsanguination — laceration of the vault of vagina by introduction of foreign object"; (b) that the foreign object which caused the laceration or tear was "a blunt instrument of certain dimensions . . . [s]omething in the nature of a stick, a rod, the end of a wooden coathanger"; and (c) that the laceration could not be caused by normal sexual activity. He

summarized the cause of death as the insertion of a foreign object in the deceased's vagina, resulting in excessive bleeding, loss of blood, and ultimately death.

The question presented is whether the evidence which we have summarized above was sufficient, if believed, to warrant the jury in finding that the defendant unlawfully killed Mary Prisinzano with malice aforethought. The word "malice" as thus used does not imply or require proof of ill will by the defendant toward the deceased. It includes any intent to inflict injury upon her without legal excuse or palliation. If there was an intention on the part of the defendant to inflict injury upon the deceased which was not justified on any lawful ground or palliated by the existence of any mitigating circumstances, that intention was malicious within the meaning of the law. *Commonwealth* v. *Webster,* 5 Cush. 295, 304. *Commonwealth* v. *Bedrosian,* 247 Mass. 573, 576. *Commonwealth* v. *Boyajian,* 344 Mass. 44, 48. ". . . [I]t is possible to commit murder without any actual intent to kill or to do grievous bodily harm, and, . . . reduced to its lowest terms, malice in murder means knowledge of such circumstances that according to common experience there is a plain and strong likelihood that death will follow the contemplated act, coupled perhaps with an implied negation of any excuse or justification." *Commonwealth* v. *Chance,* 174 Mass. 245, 252. If the defendant intentionally inflicted injury on the deceased, there is no evidence of any justification, excuse, palliation or mitigation for such act.

The evidence on which the jury were asked to determine the factual issues of whether the defendant inflicted the vaginal wound on the deceased, and, if he did, whether he did so intentionally, was circumstantial. The rules governing the proof of crimes or elements thereof by circumstantial evidence, the probative value of such evidence, and the drawing of inferences from facts and circumstances have been stated and applied in so many cases from *Commonwealth* v. *Webster,* 5 Cush. 295, 310–318, to the present time that they need not be repeated here. It is sufficient if we

have before us the following "guides" which were stated recently, with supporting citations, in *Commonwealth* v. *Medeiros*, 354 Mass. 193, 197. "It is not essential that the inferences drawn from facts or circumstances be necessary inferences. . . . It is enough if the inferences . . . be reasonable and possible. . . . It is not necessary to prove that no one other than the accused could have done the act. . . . That another might have had the opportunity to do the act goes only to the weight of the evidence. . . . The weight of the evidence is for the jury."

Applying these well-settled rules, we hold that the evidence in this case was sufficient to permit the jury to find facts which, with inferences they might properly draw therefrom, would "be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty, that the accused, and no one else, committed the offence" of which he was found guilty. *Commonwealth* v. *Webster*, 5 Cush. 295, 319. *Commonwealth* v. *Russ*, 232 Mass. 58, 68. There was no error in the denial of the defendant's two motions for directed verdicts of not guilty.

In accordance with the duty imposed upon us by G. L. c. 278, § 33E, as amended through St. 1962, c. 453, we have reviewed the entire record and evidence, and upon consideration thereof we are of the opinion that justice does not require a new trial or the entry of a verdict of a lesser degree of guilt. The judgment is affirmed.

*So ordered.*