STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
LAMAR CONYERS, DEFENDANT-APPELLANT.

Argued November 23, 1970—Decided March 26, 1971.

126

*Mr. Arthur Penn,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Geoffrey Gaulkin,* Hudson County Prosecutor, and *Mr. Gregory J. Castano,* Assistant Prosecutor, argued the cause for respondent (*Mr. Edwin H. Stern,* Chief Assistant Prosecutor, and *Mr. Armand Pohan,* Assistant Prosecutor, on the brief).

The opinion of the Court was delivered by

WEINTRAUB, C. J. Defendant was convicted of murder in the first degree. The jury not having recommended life imprisonment, the death sentence was imposed. *N. J. S. A.* 2A:113–4. Defendant's appeal comes directly to us. *R.* 2:2–1(a)(3).

Defendant asserts errors with respect to both the finding of guilt and the imposition of the death penalty. The State denies there was error in either respect, but, in the words of the State's brief, "the present Prosecutor feels it incumbent to advise the court that, as a policy matter, he would not seek the death penalty in this matter if it were moved for trial at this time; and also, that he does not seek or desire the execution of the present defendant." The State adds that it "is of the opinion that this Court can amend a death sentence to life imprisonment, and should do so in this case." For the reasons which follow, we conclude the judgment is free from error but the prosecutor's recommendation for modification of the sentence to life imprisonment should be approved and the judgment modified accordingly.

I

Defendant contends the evidence did not warrant a finding beyond murder in the second degree, and alternatively that the finding of murder in the first degree was against the weight of the evidence.

Defendant raised the issue of the sufficiency of the proof by a motion at the close of the State's case. Defendant argued the State had not carried its burden to prove beyond a reasonable doubt that the murder was perpetrated by "willful, deliberate and premeditated killing," *N. J. S. A.* 2A:113–2, as those terms have been defined, *i. e.,* that a design to kill was conceived, was deliberated upon, and was then willfully executed, see *State v. Di Paolo,* 34 *N. J.* 279, 295 (1961), *cert. denied,* 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed.* 2d 80 (1961). Upon that motion, the State was entitled to the most favorable view of its proofs and the reasonable inferences therefrom. *State v. Reyes,* 50 *N. J.* 454, 458–459 (1967). Thus viewed, the State's case was adequate, as the following review will show.

The homicide arose out of a family setting. The victim, Albertus Conyers, Jr. (herein Junior) was defendant's nephew, defendant and Junior's father being brothers. Junior, age 16, was a high school student. It seems undisputed that Junior had kicked (or kicked in) the door at the residence of Ethelee Wooten, whose mother, Duella Jones, is the sister of both defendant and Junior's father; that Mrs. Jones asked defendant to tell Junior to stay away from Ethelee's apartment; that defendant, accompanied by Ethelee's daughter, Vickie, and a nephew, went to Junior's home to deliver a message or an order to that effect.

Junior lived with his parents and a cousin, Adam Singleton. All were home when defendant and his party arrived. The visit began with some good-natured joshing. When defendant said he wanted to talk with Junior, Junior, who was in the bedroom and heard defendant, entered the living room saying, "You want to see me, Uncle L. C.?" Defend-

ant asked Junior why he had kicked in Ethelee's door, to which Junior answered that he had not, and that the matter was "straightened out." Defendant then told Junior that Ethelee did not want him to come to her apartment again. Junior answered that she, and not defendant, should tell him so. After some further words, defendant invited Junior outside to settle the matter. Junior declined, saying "I don't have to go downstairs, because I live here." Defendant replied that he could "take you over now by dragging you downstairs." Defendant rose from his chair and ordered Junior to stand up. Junior did not do so until the third such command, whereupon defendant, two or three feet from Junior, drew a gun and fired a single shot into the boy's chest, killing him almost instantly. Defendant ran from the apartment, saying "I will call the cops. I will call the ambulance. Don't nobody come out," and when Adam Singleton started for the door to seek help, defendant, with gun in hand, warned Adam, "Don't come out here; you get it too."

Defendant, and Vickie and the nephew who had come with him, drove to the office of Joseph Connors, whom defendant knew and who was in the bail bond business. Connors testified that defendant, extremely nervous, said he needed advice because something terrible had happened; that because of a family problem he had gone to his brother's home to make peace; that his nephew "went at him and he shot him"; that Connors asked defendant for the gun, whereupon defendant handed him the weapon; that when efforts to reach an attorney failed, defendant, on Connors' advice, went with Connors to police headquarters to surrender himself.

The State's case included these additional facts: that when Connors asked defendant "where he got the gun * * * he told me he used it in his guard's job"; that there was no public record of the purchase, registration, transfer, or theft of the gun; that the gun was fired a minimum of 14

inches from the victim; and finally, that after his indictment for this murder, defendant threatened Adam Singleton and told him not to testify.

In contending the evidence cannot sustain a finding that a design to kill was conceived, deliberated upon, and then willfully executed, defendant starts with the premise that defendant was unexpectedly confronted with resistance by Junior, verbal at least, and that the shooting was an unplanned response to that surprising development. But on the motion to foreclose consideration of first-degree murder the State was entitled to the most favorable view of its proofs. This being so, the State was not limited to the hypothesis that defendant first contemplated the use of the weapon when Junior defied him, for the jury could infer that defendant came to Junior's home determined to brook no resistance from his nephew and to kill him if need be. The fact that defendant brought a gun with him could be found to support the thesis that he was so minded when he went to the boy's home. We add that this thesis could be aided by a fact defendant himself stresses, that Junior stood about 6 feet 1 inch and weighed some 170 pounds while defendant was 5 feet 7 inches and weighed 140. Upon the facts in the State's case and legitimate inferences from them, we are satisfied the issue of the degree of murder had to be sent to the jury.

■ With respect to the companion question, whether upon the total record the finding of murder in the first degree was against the weight of the evidence, it must be said that defendant's version of the affair strengthened the case against him.

The most damaging fact in the State's case as to the degree of the homicide was that defendant brought the gun with him. Defendant's statement to Connors that he had the gun because he was employed as a guard offered a basis for negating an inference that he came with a studied design to kill. But at the trial defendant insisted he came un-

armed; that it was Junior who produced the gun, and that the gun was accidentally discharged and fell to the floor as defendant, unaware of the nature of the object, sought to restrain the young man. The story just did not mesh with the circumstances, and defendant's claim that after the shot was fired, he picked the weapon from the floor, still not knowing it was a gun, added to the unbelievable quality of his account. Moreover defendant thereby challenged the testimony of Connors that defendant said he had the gun because of his employment as a guard. Indeed, defendant went on to prove that he had not been employed as a guard for some months, and that he had never been authorized to carry a weapon in that employment.

Defendant apparently gambled to seek an acquittal, and in doing so, foreclosed a solid basis for a finding that, armed for some unrelated reason, he reacted suddenly either to his nephew's defiance or to some physical movement which defendant misunderstood. The contrived nature of defendant's account of the fatal affair undoubtedly weighed against him, for the absence of some tolerable explanation with respect to the gun tended to place him in the worst possible role under the proofs, that of a cocky enforcer who went to his nephew's home to put him through some paces and to kill him if he balked.

Indeed one has the feeling that, had defendant stayed with the truth, he might have fared better as to the degree of his crime, and quite likely would have fared better with respect to penalty. But the issue for us is whether, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses," we must say "it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice, or passion," in the words of *R. R.* 3:7–11(b), the rule which existed when the motion for a new trial was heard, or that, in the words of the present rule, *R.* 3:20–1, "it clearly and convincingly appears that there was a manifest denial of justice under

the law." We cannot properly reject the jury's finding that the murder was in the first degree.

## II

Defendant claims a number of errors with respect to the adjudication of guilt. None is substantial.

On cross-examination Junior's father was asked whether he ever had to go to his sister's home "as a result of being assaulted" by Junior, to which he answered in the negative. The defense later called the sister to testify that on several weekends Junior's father told her he came to her home because Junior had "jumped on him and fight him." The trial court excluded that testimony. It had been offered with respect to the father's "credibility." The defense now concedes that that basis would not support the offer, since the father had not been asked whether he had ever made that statement to his sister. *Rule of Evidence* 22(b) provides that proof of prior contradictory statements made by a witness may in the discretion of the judge be excluded unless the witness was so examined while testifying as to give him an opportunity to explain or deny the statement. But defendant now contends the proof was admissible for a different purpose, and suggests that although that basis was not advanced to the trial court, error should nonetheless be found because it is likely the trial court would have ruled against him anyway. Specifically, defendant points out that the trial court commented that since defendant did not assert self-defense the offer could not be thought to relate to a substantive issue. Defendant agrees he did not assert self-defense, and we add that defendant did not say he came armed because he had heard of the deceased's propensity for violence. But defendant says that if evidence of the deceased's aggressiveness would be admissible upon a claim of self-defense, it should be equally admissible when the defendant contends as he does here that the shooting occurred accidentally during resist-

ance to an act of aggression. This is so. *Rule of Evidence* 47 permits proof of trait of character "for the purpose of drawing inferences as to the conduct of a person on a specified occasion," and it does not matter whether the claim is that the killing was an intentional or a merely inadvertent response to the victim's aggressiveness. But it cannot be said the trial court rejected a thesis so foreign to the thesis of credibility upon which the testimony was offered. Nor in any event could "plain error" be found, for there was no offer to prove the trait of character by a method authorized by Rule 47. That rule permits proof of a trait by evidence of reputation or of a conviction of crime which tends to prove the trait. Rather defendant sought to establish the trait by proof of specific acts of aggressive behavior.[1] Defendant points to the division of authority elsewhere with respect to whether the turbulent character of a deceased may be shown by evidence of particular instances of violent or quarrelsome conduct, citing 1 *Wigmore, Evidence* (3d ed. 1940) § 198, *pp.* 676–677. But Rule 47 settles that issue; it expressly provides that "Specific instances of conduct not the subject of a conviction of a crime shall be inadmissible." *State v. Mondrosch,* 108 *N. J. Super.* 1, 4–5 (App. Div. 1969), certif. denied, 55 *N. J.* 600 (1970).

Hence the claim of "plain error" must fail. We add that there was abundant direct evidence with respect to the fatal

---

[1] It is doubtful that defendant could have proved through the sister that the deceased had attacked his father, for the sister could say no more than that the father told her so. Such testimony would be hearsay, and admissible only if it could fit within an exception to the ban upon hearsay. Defendant suggests the testimony does come within an exception. He says the father's alleged statement to the sister was a declaration against the father's interest within *Rule of Evidence* 63(10) because to say that one's own son attacked him operated to create, in the words of the rule, "a risk of making him [the father] an object of hatred, ridicule or social disapproval in the community." This would seem to be a remote application of the rule, but it need not be pursued, since Rule 47 in any event bars proof of specific instances which are not evidenced by a conviction of crime.

event, and Junior's alleged aggressive propensity could not have bolstered defendant's incredible version of the affair. It may be said in passing that defendant sought by still other testimony to demean the deceased, and one suspects defendant hurt himself in the process.

■ Next, defendant was asked on cross-examination whether, on the previous Friday, he passed his grandniece, Vickie Wooten, outside the courtroom and said to her, "Don't talk to him, don't talk to that Prosecutor." Defendant answered that he had not done so. In rebuttal, the State, over objection, was permitted to prove that as Vickie Wooten appeared to be walking over to the assistant prosecutor who was trying the case, defendant did so admonish her. She having been a defense witness, the trial court permitted the testimony on the ground that it might show bias or interest on her part, meaning, we take it, that she was restrained in her testimony by the will or interest of the defendant. We think the ruling was within the trial court's discretion. In any event, if the ruling were wrong, the error was harmless. _R._ 2:10–2.

As mentioned earlier, Connors testified for the State that defendant came to his office, told him of the shooting, and handed over the gun, explaining that he had the gun because of his employment as a guard. Defendant testified that he met Connors on the street rather than in Connors' office, and that he did not tell Connors that he had the gun in connection with work as a guard. Defendant called his former employer who testified that defendant had not been furnished or authorized to have a gun in connection with that work. The State called Connors in rebuttal, and over objection Connors repeated very briefly that defendant did enter his office and did make the statement already mentioned relating to the acquisition of the gun.

■■ Thus Connors' testimony was repetitive of what he had said during the State's main case. Perhaps the prosecutor was surprised by defendant's testimony and could

not recall whether Connors' testimony met it squarely. Perhaps the prosecutor sought to eliminate any doubt on the part of the jury as to whether Connors, if confronted by the defendant's testimony, would have misgivings as to his own recollection. The net effect was to tell the jury that Connors' version remained intact. Ordinarily testimony may not be repeated to that end, but the trial judge had considerable discretion with respect to rebuttal testimony, *State v. Balles*, 47 *N. J.* 331, 343 (1966), app. dismissed and *cert. denied*, 388 *U. S.* 461, 87 *S. Ct.* 2120, 18 *L. Ed.* 2d 1321 (1967), and we cannot say he misused his discretion. Nor do we see any possibility of prejudice.

On cross-examination, defendant was questioned about his alleged warning to Adam Singleton on Memorial Day 1968, not to testify against him. In that connection the prosecutor sought to bring out that defendant was then already under indictment. To the prosecutor's understandable surprise defendant answered that he was never indicted for this homicide, and then, that he had never appeared in court to plead to the indictment. In rebuttal the State proved that defendant had appeared and pled to the indictment. There was no objection to the testimony. We note that this is not a case in which a cross-examiner deliberately sought to create an issue of credibility by examining with respect to some topic unrelated to the issues in the case. *State v. Mathis*, 47 *N. J.* 455, 470–471 (1966). On the contrary, defendant himself injected the extraordinary statements which all counsel knew to be untrue, and which the State, without objection, thereupon contradicted. We see no basis for complaint. The defense says that the prosecution unfairly converted "an honest mistake" on defendant's part into "an ugly lie." But there is no reason for us to say the prosecutor believed that defendant was merely mistaken. Defendant never said he was.

Finally, defendant charges that the trial court denied a fair trail by improperly intervening in question-

ing defendant and his witnesses. There were no objections at the trial and we find no basis in fact for the charge.

## III

Defendant advances a number of claims of error bearing upon the death sentence.

## A.

The trial court charged the jury:

> I think I have told you about this before, but I remind you again. It's almost insulting to American people to remind you, but I will tell you. There is absolutely no place in our trials for prejudice or bias of any kind. The defendant, a man stands trial and the law applies to him equally as to any other defendant in similar circumstances. Two, it's not within your power to be kind, compassionate or to extend sympathy to any one in this case. I mean by that, sympathy should play no part in your deliberation. That too is not a question open to debate. We all have sympathy for people in distress or in harmful circumstances, but that may play no part in your consideration. This defendant, like any defendant in similar circumstances, is entitled to every right and privilege extended to him and any defendant like him in similar circumstances. No more, no less.

Defendant says that while the instruction was proper enough with respect to the issue of guilt, the jury might have thought the instruction meant also that in deciding whether to recommend life imprisonment, sympathy for the defendant was barred. There was no objection to the charge. Had there been, there is no doubt the trial judge would have dissipated the possibility of the misunderstanding which defendant now asserts.

■■■■ *N. J. S. A.* 2A :113–4 provides that upon a verdict of murder in the first degree, the punishment shall be death ·

> unless the jury shall by its verdict, and as a part thereof, upon and after the consideration of all the evidence, recommend life imprisonment * * *.

There is no stated standard for the jury's recommendation; the jury may bring into play any consideration it finds meet in the light of the evidence. *State v. Forcella,* 52 *N. J.* 263, 287–288 (1968), *cert.* dismissed, 397 *U. S.* 959, 90 *S. Ct.* 999, 25 *L. Ed.* 2d 252 (1970). Long ago, under a like statute, the United States Supreme Court noted the many matters which a jury might rationally take into account, and "sympathy" for the defendant was among them. *Winston v. United States,* 172 *U. S.* 303, 312–313, 19 *S. Ct.* 212, 43 *L. Ed.* 456, 459–460 (1899). We quoted that discourse with approval in *State v. Mount,* 30 *N. J.* 195, 206–207 (1959). Indeed there is no dissent from the proposition that a jury should not be told to exclude sympathy for the accused in deciding whether the punishment shall be death. See *Andres v. United States,* 163 *F.* 2d 468, 470 (9 Cir. 1947), reversed on other grounds, 333 *U. S.* 740, 68 *S. Ct.* 880, 92 *L. Ed.* 1055 (1948) ; *People v. Washington,* 71 *Cal.* 2d 1061, 80 *Cal. Rptr.* 567, 587–588, 458 *P.* 2d 479, 499–500 (Sup. Ct. 1969) ; *People v. Vaughn,* 71 *Cal.* 2d 406, 78 *Cal. Rptr.* 186, 195, 455 *P.* 2d 122, 131 (Sup. Ct. 1969) ; *People v. Anderson,* 64 *Cal.* 2d 633, 51 *Cal. Rptr.* 238, 243–244, 414 *P.* 2d 366, 371–372 (Sup. Ct. 1966) ; *People v. Polk,* 63 *Cal.* 2d 443, 47 *Cal. Rptr.* 1, 6, 406 *P.* 2d 641, 646 (Sup. Ct. 1965) ; *State v. Conner,* 244 *N. C.* 109, 92 *S. E.* 2d 668, 671 (Sup. Ct. 1956) ; *State v. Crawford,* 260 *N. C.* 548, 133 *S. E.* 2d 232, 240–241 (Sup. Ct. 1963) ; *Pixley v. State,* 406 *P.* 2d 662, 669–670 (Wyo. Sup. Ct. 1965).

The instruction against bias and sympathy is a boiler-plate charge relating to the juror's role in finding the facts. It of course is not intended to foreclose compassion for the accused with respect to punishment, and the possibility is exceedingly remote that a jury would be misled. It is noteworthy that in none of the cases cited in the preceding paragraph was a judgment reversed on that account, and in *Vaughn,* where the penalty was the only issue before the jury, the California Court expressly withheld deciding

138

whether the instruction was a "substantial error" calling for a new trial.

We need not discuss the cited cases in detail. It is enough to say that in none was the court persuaded to reverse on the ground that the jury might have thought the intent was to limit its discretion as to punishment. Indeed, despite the widespread, although not universal, use of such instructions in capital cases in our State, this is the first in which the possibility of such a view of the instruction was asserted, and then only by a belated claim on appeal. As we have said, the bias-sympathy instruction relates to the fact-finding process, and usually appears, as in the case at hand, amid other instructions dealing with the evaluation of testimony. The purpose of course is to admonish the jury to find the facts free of the tainting influence of bias or sympathy. It is not reasonable to suppose a jury would lift so much of the admonition as refers to sympathy and transfer it to the consideration of what the penalty should be. Laymen customarily identify mercy or compassion as relevant upon the issue of life or death. It would take a plain direction to dissipate that understanding.

Nor did anything occur during the trial which could have led the jury thus to misunderstand the instruction. On the contrary, the trial events served to emphasize the normal meaning of the charge. The subject of sympathy appeared in the *voir dire* of the veniremen, and it was there raised by the defense. Counsel, concerned with sympathy for the deceased and his family, sought the jurors' commitment against that emotional response. On occasions, the trial court pursued the defense theme in questioning the veniremen, referring to a juror's obligation to decide the case on the evidence, free of bias, prejudice or sympathy. In his summation, defense counsel, who spoke only upon the issue of guilt, urged the jury to decide the case on the proof, unaffected by "sympathy." Thus he said that "all I ask you is not a sympathetic verdict because that wouldn't be a true

verdict"; "I am not asking you to be sympathetic to the defendant or show favoritism to the State because we are all part of the State"; and that defendant should be acquitted "not because of any prejudice, bias or sympathy" but because of the evidence in the case. In the State's summation there was no intimation that sympathy for the defendant was not relevant on the subject of punishment. On the contrary, the prosecutor affirmatively noted the propriety of that consideration, saying "Now, there are some cases where mercy is deserved," and "there are many cases where mercy might be warranted, but not this one."

▮▮▮ With this backdrop, there is no reason to say the jurors could have thought the trial judge intended to exclude mercy or compassion from their judgment upon the death penalty. A recommendation of life imprisonment is popularly called a recommendation of "mercy." This being so, and the prosecutor himself having noted the presence of the question of "mercy," it would be remarkable if the jury thought it was restrained in that regard. The charge spoke of bias and prejudice as well as of sympathy, and related sympathy, not merely to the defendant, but "to anyone in this case." The charge was part of a discursive treatment of the fact-finding function of the jury and the sundry matters a jury may take into account in deciding what to believe. We are satisfied the jury understood the instruction in that light. That no objection or request for clarification was made below fortifies our conviction that in the context of the trial and of the entire charge, the possibility of misunderstanding is unreal. We cannot say there was plain error. *State v. Macon,* 57 *N. J.* 325, 333 (1971).

In view of the challenge before us, it is appropriate to add that when the bias-sympathy instruction is given in a capital case, it would be provident to tell the jurors the instruction is intended to guide them with respect to finding the facts and not to bar consideration of mercy or compassion in dealing with the penalty issue.

## B.

The next point involves the exclusion of jurors because of their position with respect to the death penalty. Defendant contends the jury was selected in violation of *Witherspoon v. Illinois,* 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed.* 2d 776 (1968). In essence, defendant questions the view of *Witherspoon* we took in *State v. Mathis,* 52 *N. J.* 238 (1968), and *State v. Forcella, supra,* 52 *N. J.* at 290–296, and to which we adhered in *State v. Artis,* 57 *N. J.* 24, 36 (1970) ; *State v. Wilson,* 57 *N. J.* 39, 53–54 (1970), and *State v. Sinclair,* 57 *N. J.* 56, 69 (1970). The defense did not object to any of the trial court's rulings, thus accepting them as consonant with *Mathis.*

The veniremen were examined with meticulous regard for *Witherspoon.* Each juror was asked whether he had any scruples against capital punishment. If the juror answered that he did, he was questioned further and ultimately with respect to whether he could ever consider the death penalty in any case. Some of the negative responses took the form of "I don't think I could" or the like. Defendant urges that nothing less than a literal, flat "no" can justify exclusion under *Witherspoon.*

We said in *Mathis, supra,* 52 *N. J.* at 244 :

> In other words, we read *Witherspoon* to recognize that the State is entitled to jurors who are impartial as to punishment, but it holds that a juror is impartial even though he has a bias against the State upon that topic, provided his bias is not so strong as to preclude him from considering the issue of punishment. Although a lesser bias might constitute 'cause' if it ran against a defendant (*i. e.,* racial, religious, or ethnic prejudice), the bias here involved is deemed to be logically relevant to the question whether the death penalty should be imposed in a given case and hence a jury would be unrepresentative of the community conscience if there were excluded all who would have a distaste for capital punishment. But the State is entitled to 'a jury *capable* of imposing the death penalty' (88 *S. Ct.,* at *p.* 1776 ; emphasis added).

After pointing out that earlier decisions in our State had laid down the same test, we continued (52 *N. J.* at 247–248) :

"Hence the jury was selected with the correct test in mind. We have examined the record to see whether the trial court nonetheless erred in its evaluation of the testimony of any of the veniremen. In doing so, we of course recognize that a layman's responses are frequently imprecise and that accordingly a trial judge must penetrate the verbal crust to decide whether the juror is truly able to consider the issue of punishment. In that process the trial judge, who sees and hears the juror, is better situated than we, and hence we would not lightly disagree with his judgment. * * *

We find no error. We think the testimony of only a few veniremen need be discussed. One juror (Schnell), asked whether he was 'unable in any case to vote for a verdict carrying with it capital punishment,' said at first that he did not know, never having before been confronted with the question; then that 'I am not sure, but I think so,' i. e., that he was unable in any case to vote for a death penalty; and finally that 'I can't definitely say I could or I couldn't.' He was excused for cause, and we think properly. The trial court did not state the precise basis of its ruling. It could have been that the juror was unable to consider the subject of penalty, a finding which such testimony would well warrant. But, if we accept literally the juror's final statement that he could not definitely say whether he was unable to vote for a death sentence, cause was nonetheless established. The State is entitled to a juror who is impartial, i. e., one who is capable of considering whether the death sentence may be meet. Impartiality is a positive attribute. Its presence must appear affirmatively. If a juror, acknowledging racial, religious, or ethnic bias against an accused, is unable to say whether he could or could not judge the case on the merits, he is not an impartial juror. So here, the State is entitled to a juror who can at least assure the court that he will judge.

In insisting that a negative response will not suffice for exclusion unless the venireman expresses it with a literal "no," defendant refers to the restatement of *Witherspoon* in *Boulden v. Holman,* 394 *U. S.* 478, 89 *S. Ct.* 1138, 22 *L. Ed.* 2d 433 (1969), and *Maxwell v. Bishop,* 398 *U. S.* 262, 90 *S. Ct.* 1578, 26 *L. Ed.* 2d 221 (1970). We see nothing in either opinion which would question the view of *Witherspoon* we took in *Mathis.* In both *Boulden* and *Maxwell,* the Court restated the holding of *Witherspoon* and then placed in the text two excerpts from footnotes in *Witherspoon.* Thus in *Maxwell* (398 U. S. at 265–366, 90 S. Ct. at 1580–1581, 26 *L. Ed.* 2d at 224), the holding of *Witherspoon* is repeated and then followed by excerpts from footnotes 9 and 21 in *Witherspoon*:

142

As was made clear in Witherspoon, "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U. S., at 522, 88 S. Ct. at 1777. We reaffirmed that doctrine in Boulden v. Holman, 394 U. S. 478, 89 S. Ct. 1138, 22 L. Ed. 2d 433. As we there observed, it cannot be supposed that once such people take their oaths as jurors they will be unable "to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case." 394 U. S., at 484, 89 S. Ct. at 1142, 22 L. Ed. 2d at 439. "Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." Witherspoon v. Illinois, supra, 391 U. S. at 516 n. 9, 88 S. Ct. at 1770 n. 9, 20 L. Ed. 2d at 782, 88 S. Ct. 1770.

"The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the voir dire testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out * * *." Id., at 522 n. 21, 88 S. Ct. at 1777 n. 21, 20 L. Ed. 2d at 785.

Defendant stresses the words "unambiguously" and "automatically" in the excerpt from footnote 9 of *Witherspoon*. We cannot find in those words or in the total excerpt from footnote 9 a decision to exalt form over substance, and indeed to accept a layman's verbalization as binding evidence of his attitude. Impartiality is a matter of fact, and a judge is no more bound by semantics on that inquiry than upon any other factual inquiry. 47 *Am. Jur.* 2d, *Jury,* §§ 210–211, *pp.* 799–800; *State v. Van Duyne,* 43 *N. J.* 369, 386 (1964) ; *State v. Jackson,* 43 *N. J.* 148, 158–160 (1964), *cert.* denied *sub. nom. Ravenell v. New Jersey,* 379 *U. S.* 982, 85 *S. Ct.* 690, 13 *L. Ed.* 2d 572 (1965) ; *Irvin v. Dowd,* 366 *U. S.* 717, 728, 81 *S. Ct.* 1639, 6 *L. Ed.* 2d 751, 759 (1961). Hence a trial court may find that a venireman cannot consider the death penalty even though the venireman states no more than a belief that he could not or a doubt that he could.

Nor does the excerpt from footnote 9 conflict with our further understanding of *Witherspoon,* that impartiality is a positive attribute, so that a venireman is not qualified if he cannot assure the court that he is able to consider the authorized punishments. Although the excerpt from footnote 9 says negatively that "it simply cannot be assumed" that a venireman's "position" is that "he would automatically vote against the imposition of capital punishment no matter what the trial might reveal" unless the venireman "states unambiguously that he would automatically" so vote, the excerpt does not deal wtih the venireman who is unable to say that he could consider the death penalty. To read the excerpt to embrace that situation would render meaningless the quoted excerpt from footnote 21. For if it may be "demanded" by the State, as the excerpt from footnote 21 says, that the venireman "be willing to consider all of the penalties," it can hardly be maintained that that demand is met when a venireman believes he is unable to do so or cannot say that he could. It would trifle with good sense to find affirmatively that a *willingness* to do something exists when the individual cannot assure the court that he could even attempt it.

 *Witherspoon* recognized as legitimate the State's "quest for a jury *capable* of imposing the death penalty" (emphasis ours), 391 *U. S.* at 521, 88 *S. Ct.* at 1776, 20 *L. Ed.* 2d at 784. A juror therefore is not impartial unless it affirmatively appears that he has that capability. We think it clear that a venireman would not be impartial if he said he did not know whether he could ever consider a life sentence. Unless *Witherspoon* intended a different standard with respect to the State's demand for an impartial jury, it must be that a venireman is not impartial if he is thus uncertain about his ability to consider the death penalty.

 Surely a juror's impartiality is an affirmative attribute with respect to the issue of guilt. A venireman who has a bias or preconception is not qualified if he is

unable affirmatively to assure the court of his ability to lay that bias or preconception aside and to try the issue fairly. *People v. McQuade,* 110 *N. Y.* 284, 18 *N. E.* 156, 161–163 (Ct. App. 1888) ; *Bryant v. State,* 72 *Nev.* 330, 305 *P.* 2d 360, 361–362 (Sup. Ct. 1956) ; *Singer v. State,* 109 *So.* 2d 7, 19–25 (Fla. Sup. Ct. 1958). If doubt exists, he must be excused. *State v. Jackson, supra,* 43 *N. J.* at 158–160 ; *State v. Van Duyne, supra,* 43 *N. J.* at 386. If impartiality is thus an affirmative attribute with respect to such triable issues, it would be incongruous to accept less in the setting before us. As Mr. Justice White pointed out in his dissent in *Witherspoon,* 391 *U. S.* 510, 540, 88 *S. Ct.* 1770, 20 *L. Ed.* 2d 776, 795, the Constitution has never been construed to make punishment a triable issue of fact or to require the issue to be tried by jury. *Witherspoon* nonetheless held that, although punishment is not constitutionally a triable issue of fact, yet, if the issue is given to a jury, there must be invoked the concept of impartiality which is an attribute of the constitutional right to trial by jury as to guilt. It would be strange to deny the State the affirmative indicia of impartiality required with respect to the trial of issues which constitutionally must be tried by jury.

We add that other courts have upheld challenges to jurors who, asked whether they could ever consider the death penalty, answered "I do not think I could" or in like terms. See *Segura v. Patterson,* 402 *F.* 2d 249, 251–252 (10 Cir. 1969) ; *State v. Aiken,* 75 *Wash.* 2d 421, 452 *P.* 2d 232, 242–243 (Sup. Ct. 1969) ; *Williams v. State,* 228 *So.* 2d 377, 380–381 (Fla. Sup. Ct. 1969) ; *Ladetto v. Commonwealth, Mass.,* 254 *N. E.* 2d 415, 416, 418 (Sup. Jud. Ct. 1969) ; *Commonwealth v. Mangum, Mass.,* 256 *N. E.* 2d 297, 300 (Sup. Jud. Ct. 1970) ; *Thames v. State,* 453 *S. W.* 2d 495, 498 (Tex. Cr. App. 1970) ; but *cf. Marion v. Beto,* 434 *F.* 2d 29 (5 Cir. 1970). Although some earlier California cases went the other way, *People v. Terry,* 2 *Cal.* 3d 362, 85 *Cal. Rptr.* 409, 418–419, 466 *P.* 2d 961 (Sup. Ct. 1970), upheld a challenge for cause upon that showing.

Defendant contends that as to one venireman, the trial court's ruling did not accord with the view we have taken of *Witherspoon*. Upon a literal reading of the record, this would appear to be so, but since the trial court and counsel were operating under *Mathis* and counsel made no objection, one may fairly assume that something transpired to make it evident to all that nothing could be gained by exploring the subject further. The demeanor of a witness may be as revealing as his words. *Reynolds v. United States,* 98 *U. S.* 145, 156–157, 25 *L. Ed.* 244, 247 (1879). Here the juror interrupted the trial court, as the transcript shows,[2] and no doubt did so in a way to satisfy everyone that it would be useless to continue. In any event, if we deemed the ruling to be reviewable notwithstanding the defendant's failure to object below, see *State v. Macon, supra,* 57 *N. J.* at 333, it would not lead to a reversal. The issue is whether the totality of the trial court's treatment of the subject of capital punishment operated to deprive the defendant of an opportunity for a jury of a representative quality. An error in the application of the correct principle to one juror would not establish a denial of the basic right. *State v. Mathis, supra,* 52 *N. J.* at 250–251; *State v. Wilson, supra,* 57 *N. J.* at 54; *State v. Sinclair, supra,* 57 *N. J.* at 70. We add, as a makeweight, that the State used but 7 of its 12 peremptory challenges. See *Mathis, supra,* 52 *N. J.* at 251.

## C.

Finally, defendant advances sundry challenges to capital punishment which we rejected in *State v. Forcella, supra,*

[2] Do you have any conscientious or personal, religious scruples—
THE JUROR: I don't believe in the death penalty.
THE COURT: How long have you had this feeling or belief?
THE JUROR: Always. No, I don't believe in it.
THE COURT: For how long do you think you had this feeling?
THE JUROR: I guess since I — an adult or — you want a year? Twenty-one. Since I was 21.
THE COURT: You are excused from this case.

52 *N. J.* 263. We need not add to what we said there on those subjects. See also *State v. Artis, supra,* 57 *N. J.* at 36–37 (1970) ; *State v. Wilson, supra,* 57 *N. J.* at 55 ; and *State v. Sinclair, supra,* 57 *N. J.* at 70.

## III

We come then to the final question whether we may, and should, approve the prosecutor's waiver of the death penalty, notwithstanding the jury's verdict.

It has long been recognized in our State that the prosecutor may decide not to seek the death penalty. It was said by way of dictum in *State v. Pontery,* 19 *N. J.* 457, 468 (1955), that despite the prosecutor's waiver, the jury could return a death verdict. We later announced our disagreement with that dictum, to the end that the prosecutor's decision, if approved by the trial court, would take the death issue out of the case. *In re Waiver of Death Penalty,* 45 *N. J.* 501 (1965). *R.* 3 :1–3 provides accordingly :

If the indictment charges a crime punishable by death, the prosecutor with the approval of the court may waive the death penalty. If the death penalty is so waived, no provision dealing specially with death penalty cases shall thereafter apply.

It must be said that when the rule was adopted, the focus was upon the trial scene alone. We did not have in view the question whether the prosecutor could disclaim the death penalty after a jury's verdict, either at the trial or at the appellate level. Later we applied the philosophy of the rule in an appellate setting, when we held that if there is reversible error affecting the death penalty alone, the prosecutor may, with our approval, waive the death penalty, in which event the judgment of conviction would be modified by substituting life imprisonment. *State v. Laws,* 51 *N. J.* 494, 501–515 (1968), *cert. denied,* 393 *U. S.* 971, 89 *S. Ct.* 408, 21 *L. Ed.* 2d 384 (1968) ; *State v. Royster,* 57 *N. J.* 472, 491–492 (1971). The case at hand of course differs,

for here there is no legal error affecting the jury's decision upon the penalty, and the question therefore is whether the prosecutor's discretion expired upon the return of the verdict.

To sharpen the question, we note that we have never held a trial court may take the penalty issue from the jury on the thesis that the evidence would not support a death sentence, or that the jury's failure to recommend life imprisonment is reviewable in terms of the sufficiency or the weight of the evidence. The practice elsewhere in that regard was canvassed comprehensively in *State v. Laws, supra,* 51 *N. J.* 494, and we need not repeat the discussion. We refer to the state of our law upon that subject to stress that the question before us is not whether the State may confess error with respect to an accepted appellate issue, but rather whether, if it be assumed that the death penalty is not reviewable as to the sufficiency or the weight of the evidence, there nonetheless abides in the prosecutor the discretion to decline the death penalty, subject to the court's approval.

We think the prosecutor's authority to decline the death penalty with the court's approval should survive the jury's verdict. This follows reasonably from the same policy which authorizes a waiver before trial. It is settled that a prosecutor has considerable discretion in the application of the comprehensive criminal laws to the myriad situations which come within their letter. That discretion is essential, lest the criminal law overshoot its mark and inflict consequences contrary to the justice of a particular case. His discretion, subject of course to the check of the judiciary, is thus a safety valve. Accordingly we held that, as in other situations, the Legislature intended the prosecutor to exercise some judgment in the application of the death provision.

It is true that when a jury has spoken, another dimension has been added to the problem. Because the death penalty involves a moral judgment upon a consideration of the evidence, free of legalisms and unbridled with respect to the values which may be brought to bear, it may readily be said

that the judgment of 12 laymen in any given case is as good as the judgment of an equal number of men schooled in the law. Yet the prosecutor is better situated to seek equality of treatment of offenders, for the prosecutor knows the situations in which he did not seek the death sentence and is familiar with the run of jury verdicts in cases in which he did. Indeed, the assistant prosecutor who tried this case stated to us that he was moved to withdraw from his original appraisal because he now believes the death penalty in this case is out of line with the experience in his county over a period of many years. It is understandable that a prosecutor may take a different view of a situation after a trial, for as every lawyer knows, the trial of a case can yield a perspective his office file did not reveal.

The issue before us is of course arguable, but substantial doubts should be resolved in favor of life. It is therefore fitting to say that the discretion of the State's representative to recommend against the death penalty survives the jury's verdict and may be advanced before the judiciary so long as the judgment remains subject to direct review. Thereafter the Governor alone may deal with the subject.

The question then is whether we should approve the prosecutor's recommendation. We think we should. Defendant's involvement began innocently; his sister asked him to relay a message to the deceased to stay away from her daughter's home. As we already commented, the visit began on a friendly note. Defendant fired a single shot, and did so after being crossed by the boy, perhaps to his embarrassment before the assemblage. It is clear that immediately after the shooting defendant was overwhelmed by the enormity of his act. He surrendered to the police promptly.

Initially defendant was released on bail of $3,500, a fact which hardly reflected that the supreme penalty was anticipated. But defendant then pursued a course of foolishness which dimmed his prospects. He threatened a State's witness, as we mentioned above, and we gather his bail was

revoked on that account. At the trial he told an impossible story, denying he came with the gun and thus foreclosing a possible explanation to negate the inference that he came prepared to shoot. At the trial, he sought to disparage the boy he had killed. He also testified untruthfully as to several matters with no possible advantage to his defense. Thus he unwittingly contributed to the image of a domineering man who came prepared to execute the boy before the eyes of his parents if the boy should defy him. We have a strong feeling that if the truth of the killing had not been tarnished by defendant's later absurd misbehavior, the death sentence would not have been imposed. In the vernacular, defendant was his own enemy. Under all the circumstances, the prosecutor's waiver of the death sentence is consonant with justice. It is therefore approved.

The judgment of conviction is modified to substitute life imprisonment for the death sentence, and as thus modified, the judgment is affirmed.

PROCTOR, J. (concurring). I agree with the majority that we should accept the prosecutor's waiver of the death penalty in this case even though the trial was free of error. In *State v. Laws,* 51 *N. J.* 494, 509–510 (1968), I set forth my view that we could reduce a jury imposed death penalty to life imprisonment if the prosecutor agreed to waive the death penalty, but that we could not do so in the absence of such a waiver. I was able to concur with the majority in *Laws* only because the prosecutor there agreed to waive. The issue arose again in *State v. Royster,* 57 *N. J.* 472 (1971) and I concurred noting the necessity for a prosecutorial waiver of the death penalty which was again given. *Id.* at 492. Today's opinion by the majority rests on the premise that the prosecutor agreed to waive the death penalty and in this respect comports fully with what I have maintained from the start.

FRANCIS, J. (dissenting). This is the third time in a short period that the majority of my colleagues have set

aside a death penalty verdict returned by a jury after an unquestioned fair trial on the issue of guilt of first degree murder and have substituted therefor a sentence of life imprisonment. In each of the first two cases I dissented because of a strongly held view that the Court's action constituted a patent violation of the controlling statutory mandate and an unconstitutional trespass upon the prerogatives of our co-equal branch of the government, the Legislature. See *State v. Royster,* 57 *N. J.* 472, 492 (1971); *State v. Laws,* 51 *N. J.* 494, 518–562 (1968). The present case is the most startling of the three because the Court's ruling here violates the constitutional doctrine of separation of powers in not one, but in two particulars. In *Royster* and *Laws* there was an unwarranted intrusion into the exclusive legislative domain. In this instance the majority have not only assumed a power which resides exclusively in the legislative branch of the government, but have also arrogated to themselves the commutation authority which, under the Constitution, resides in the executive branch of the government alone, *i. e.,* the Governor.

The prosecutor who was in office when the homicide involved here was committed obtained a first degree murder indictment against the defendant. The assistant prosecutor who prepared the case and who tried it before a jury, believing that a death penalty was warranted, asked the jury to return such a penalty. The trial court advised the jury that the Legislature had prescribed the penalty for first degree murder in mandatory terms and instructed them that the controlling statute said that persons found guilty of murder in the first degree *"shall* suffer death *unless* the jury shall by its verdict, and as a part thereof, upon and after the consideration of all of the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed." (Emphasis added.) *N. J. S. A.* 2A:113–4. After considering all of the evidence, the jury found no sufficiently mitigating circumstances to move them toward the lesser alternative, and so they declined to

recommend life imprisonment. The trial court then fulfilled its inescapable duty and imposed the death sentence.

After defendant took his appeal directly to this Court, a new prosecutor was appointed for Hudson County. Prior to argument here, the new prosecutor, in his brief, said:

[T]he State is of the opinion that there was no error below either with respect to the determination of guilt or the imposition of the death penalty.

However, the prosecutor advised the Court that "as a *policy matter*" he would not seek the death penalty if the case were moved for trial "at this time," and also, that he does not seek or desire the execution of the present defendant. (Emphasis added.) Moreover, he expressed the opinion that this Court can and should amend the death sentence to life imprisonment. In Point X of the State's brief his *legal* position as distinguished from his *policy* position is expressed thus:

The jury's imposition of the death penalty *cannot* be reviewed and *was not against* the weight of the evidence; but if this Court determines that the death penalty can be reviewed and was against the weight of the evidence, *then* the State requests that this Court modify the sentence to life imprisonment. (Emphasis added.)

In presenting his position under the point he said:

[I]f the evidence warrants a finding of guilt, it likewise warrants the imposition of death; and in the absence of procedural errors and of more specific statutory standards for punishment, there is no further basis for appellate review of the death penalty as being against the weight of the evidence.

The State then argued that even if this Court feels that the statute quoted above does not preclude review of the sentence, "the facts of this case and principle regarding scope of review indicate that the imposition of death was not unjustified in the instant case." Referring to the record, the brief continued:

The evidence showed that the defendant premeditatedly and without provocation, cold-bloodedly shot his 16-year old nephew; that he fled the scene of the crime with a warning that no one follow him or they would "get it, too"; and that he subsequently sought to intimidate two eyewitnesses. * * * An argument that the attack was not savage or brutal in character is a specious exercise in esthetics; it assumes that a killing by a single efficacious bullet is less morally culpable than a bloody beating.

After a full consideration of the record, this Court has found unanimously that the defendant had a fair and errorless trial. Thus, unlike *Laws* and *Royster* where the Court found trial error affecting the penalty, we all agree, that here there was no error at the trial as to the matter of guilt or punishment. Obviously, therefore, if the original prosecutor were still in the case, the jury's verdict would be affirmed. But because the new prosecutor (who unqualifiedly agrees that the trial result was legally sound) advises us that as a matter of policy he would not have sought the death penalty in this case and is now willing to waive it even though the jury has imposed it, the majority of my colleagues have bowed to his statement of personal policy and have downgraded the penalty to life imprisonment. Thus the Court recognizes in the prosecutor a greater control over a death sentence determined upon by a jury after a fair consideration of all the evidence than the Court could exercise on its own on the trial record presented to us. If the advent of a new prosecutor with a different policy with respect to the death penalty, or a change of heart by the original prosecutor after trial and verdict, is allowed to expunge the jury verdict, there is little point in spending weeks searching for an impartial jury capable of giving fair consideration to imposition of the death penalty in cases where the evidence warrants it.

As I have said in the earlier dissents, the Legislature has established the policy with respect to the death penalty. It decided, as our Constitution authorized it to do, that twelve citizens representing a cross-section of the community are adequately equipped to evaluate the facts of a murder and

to decide the issue of life imprisonment or death. So, the legislators concluded that the choice between the two alternatives should be left to the sole discretion of the twelve citizens. As I see the operation of the separation of powers doctrine, the judicial branch of government must accept that mandatory expression of the legislative will. If jurors are not qualified for service in homicide cases when they have unyielding scruples against capital punishment, I do not believe I should sit as a judge in such cases if I allowed any personal policy views respecting capital punishment to influence me against impartial administration of the legislative mandate.

The Constitution has established a method of dealing with situations like the present one. *N. J. Const.*, Art. V, § 2, ¶ 1 commits to the Governor power to commute a death sentence to life imprisonment. He has broad discretionary power to investigate and decide an application for commutation by a defendant who received such a sentence in the judicial branch of the government. See *N. J. S. A.* 2A:167–1, 2 and 7. A cardinal principal of our tripartite form of government is that the power to impose a death sentence upon conviction of first degree murder and the power to commute the sentence are separate, the former being in the judicial department, while the latter is delegated to the executive branch. Our Court recognized the binding separation of these powers in *State v. Butler,* 32 *N. J.* 166, 196, *cert. den.* 362 *U. S.* 984, 80 *S. Ct.* 1074, 4 *L. Ed.* 2d 1019 (1960). There a death sentence had been imposed upon the defendant. At the trial strongly probative evidence against him had been presented through a witness who was legally competent to testify but concededly of limited mentality. We were concerned with the sentence, but since the trial (like the present one) was free of error, we felt duty bound to affirm the judgment. In doing so we said:

But here again responsibility has been placed by our Legislature with the jury and although the Governor has been vested with power to commute the death sentence (*N. J. S. A.* 2A:167–2, *cf. N. J.*

*Const., Art.* 5, § 2, *par.* 1) this court has no comparable power. 32 N. J. at 196.

Thereafter, on May 26, 1960, the Governor commuted the sentence to life imprisonment.

In the case before us, I do not have the slightest doubt that the present prosecutor conscientiously feels that the jury should not have imposed the death penalty — that it represents too severe a punishment for the nature of the crime. However, in the face of his argument that defendant's trial was full and fair and that the evidence is adequate to support the jury's decision, I repeat that no authority exists in the courts to interfere with the sentence. But, the machinery of government has not exhausted itself. The defendant may importune the Governor to exercise his constitutional authority to commute the death sentence, and at that time the prosecutor may make known his policy and his sentiments respecting the propriety of the death penalty in this case. If commutation is warranted, it may safely be assumed that such action would be taken. However, this Court has no authority to do so, and it should have left that decision where the Constitution placed it — in the hands of the Governor.

In my opinion therefore, on the record before us, there is no choice but to affirm the judgment of the trial court.

PROCTOR, J., concurring in result.

*For modification and affirmance*—Chief Justice WEINTRAUB and Justices PROCTOR, HALL and SCHETTINO—4.

*For affirmance*—Justice FRANCIS—1.