## JOHN LORENZO WILLIAMS *v.* STATE OF MARYLAND

[No. 459, September Term, 1970.]

*Decided April 6, 1971.*

The cause was argued before MURPHY, C.J., and MOYLAN and POWERS, JJ.

*Clyde C. Henning,* with whom was *Morris Klitzkin* on the brief, for appellant.

*Robert A. DiCicco, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Linthicum, State's Attorney for Montgomery County,* and *John M. King, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, John Lorenzo Williams, was convicted in the Circuit Court for Montgomery County by a jury, presided over by Judge Plummer M. Shearin, of rape and kidnapping. He was sentenced to a ten-year term on each conviction, the sentences to run concurrently.

The sole question he raises on appeal is whether the in-court identification made of him by the victim was the tainted product of an earlier impermissibly suggestive pretrial confrontation.

On December 4, 1969, Sandra Bennett, a twenty-two-year-old woman, was leaving the J. C. Penney Company, located in the Silver Spring Shopping Center on Colesville Road in Montgomery County. As she approached her car on the parking lot behind the Park and Planning Commission, she was grabbed from behind and knocked to the ground by two men. One rifled her pocketbook and the other looked for her car keys which had fallen to the ground. Recovering the keys, one of the assailants opened the car and ordered her into the back seat. The car was then driven to a spot behind the Parking and Planning Commission. The assailants announced that they had both a gun and a knife and ordered Miss Bennett to disrobe. She was then raped by one of the men. The rapist and the driver then exchanged places. The kidnappers proceeded to drive Miss Bennett via Georgia Avenue into the District of Columbia. They then proceeded through various back streets, unknown to the victim, and stopped in an alley. The man in the back seat then proceeded to rape Miss Bennett. Shortly thereafter, the driver left the vehicle and the man in the back seat raped her a second time. The driver subsequently returned to the vehicle with a third person who also raped Miss Bennett. All three assailants then departed on foot and Miss Bennett drove home. The police were called and she was taken to the Holy Cross Hospital where she was examined.

The appellant in this case, who was arrested on December 17, 1969, thirteen days after the rape and kidnapping,

took the stand in his own defense. He admitted having been on the parking lots in the vicinity of the Silver Spring Shopping Center on December 4 but insisted that he had left the area to return to Washington at some time between 7 and 7:30 p.m. He denied any participation in the assault on Miss Bennett. He did testify, however, that on the next day he left for North Carolina, ostensibly to visit his grandmother.

Despite the fact that the appellant lived at 1617 S Street, N.W., in the District of Columbia, he was arrested at 6:30 p.m. on December 17 on the parking lot of the Park and Planning Commission near the Silver Spring Shopping Center. The police had staked the parking lot out and arrested the appellant and a companion because of their suspicious behavior. No question about the propriety of the arrest is before us.

Several items of the appellant's clothing were submitted to the F.B.I. Laboratory for analysis. An expert on the identification of human hair testified that he found on the shirt of the appellant several light brown head hairs of Caucasian origin which had been forcibly removed from the scalp. He also found on the trousers of the appellant a limb hair (from either an arm or leg) of Caucasian origin. This hair also had been forcibly removed from the skin. The expert also found on the blouse of the victim a dark brown head hair fragment of Negroid origin.

Sgt. Roger Milstead of the Montgomery County Police testified for the State as a fingerprint expert. He found that a latent fingerprint lifted from the outside of the window of Miss Bennett's automobile was the print of the appellant. Whereas only twelve points of identification are necessary to assert identity positively between a known print and a latent print, there were actually twenty-three points of identity between the print found on the glass of the automobile and the print taken from the index finger of the left hand of the appellant. When the appellant took the stand in his own defense, he testified that he and his companion had been on the parking

lot in question on the evening of December 4 for the purpose of stealing from automobiles and that as a result of that activity, he had occasion to touch many automobiles on the outside. Sgt. Milstead, however, testified that from the position of the print on the very top of the window glass, it was highly improbable that the print could have been placed there when the door was closed. Miss Bennett had testified that her automobile was locked when she left it on the parking lot. There was also lifted from the isinglass window of Miss Bennett's wallet a latent print which had four points of identity with the known print of the appellant. While on the basis of four points of identity, Sgt. Milstead could not assert positively that the print found on the victim's wallet was that of the appellant, he nevertheless asserted that there was a great probability that it was the appellant's print. After being pressed on the degree of probability during cross-examination, Sgt. Milstead asserted that on the basis of four points of identity the odds against the latent print's having been anyone but the appellant's would be four million to one.

At the trial, Miss Bennett positively identified the appellant as her assailant. The State did not adduce from her any testimony as to pretrial confrontations.

The appellant, however, had made a pretrial motion to suppress any in-court identification. A pretrial hearing was held before Judge Kathryn J. Shook. Judge Shook ruled against the appellant and refused to suppress evidence of identification. The appellant renewed his motion to suppress the identification at the trial on the merits. Both the appellant and the State agreed, in a conference with Judge Shearin out of the presence of the jury, that they had no new evidence to offer on the question other than that earlier adduced before Judge Shook. Judge Shearin reviewed the transcript of the pretrial suppression hearing and permitted counsel to reargue the question on the law. He then ruled as Judge Shook had earlier ruled and refused to suppress evidence of identification.

The appellant's thesis is that the in-court identification

of April 20, 1970, flowed from an earlier identification made at a preliminary hearing held on January 7, 1970, and that the January 7 identification was, in turn, the result of an impermissibly suggestive photographic viewing conducted approximately thirty minutes before the commencement of the preliminary hearing. That the conduct of the preliminary hearing and the identification made thereat was proper in all respects is not disputed. The appellant was there represented by counsel. There was nothing impermissibly suggestive about the circumstances at that hearing itself. *Holmes v. State,* 10 Md. App. 253; *Tyler v. State,* 5 Md. App. 265. As to the photographic viewing which the appellant claims tainted the identification made at the preliminary hearing, the appellant was very explicit in argument before this Court that he was not relying upon any right to counsel claim under the Sixth Amendment and *United States v. Wade,* 388 U. S. 218, but exclusively upon a due process claim under the Fourteenth Amendment and *Stovall v. Denno,* 388 U. S. 293.

Shortly after the appellant's arrest on December 17, 1969, a lineup containing the appellant and four other individuals was viewed by Miss Bennett. The appellant was represented by the Public Defender of Montgomery County and the lineup was fair and proper in every respect. However, Miss Bennett could not positively identify anyone. On the morning of January 7, 1970, shortly before the preliminary hearing commenced, Miss Bennett was shown a photograph of the lineup, showing all five individuals who had participated in the lineup, and at that time picked out the appellant as her assailant. The appellant's position is that after the initial failure of Miss Bennett to identify him at the December 17 lineup, it was improper for the authorities to later show Miss Bennett a photograph of that lineup. He cites *Rath v. State,* 3 Md. App. 721. The case before us bears little similarity to *Rath,* however. In that case, the victim had earlier picked out a completely innocent man from a lineup and on the morning immediately preceding trial was

shown photographs by the State's Attorney of the defendants in that case and of no one else.

In the case at bar, there had been no misidentification by Miss Bennett on December 17. She simply could not make a positive identification. She had on December 4 given the police a good description of her assailants, which description was not at variance with the actual appearance of the appellant. In testifying at the trial about her failure to make a positive identification on December 17, she stated, under cross-examination:

"The night I looked at the line-up I was scared. I picked out two persons in my own mind who I thought were the ones. The more I thought about it, the more I decided that one of them was definitely one of them."

On redirect examination, she testified further:

"Q. You testified that at the line-up on the date that the line-up was held, the 17th, on the 17th of December, that you were frightened or afraid or scared, I forget the word you used?
A. Petrified is more like it.
Q. Will you tell the ladies and gentlemen of the jury what you were petrified of?
A. I had never been in a line-up before in my life. I didn't know what to expect when I went in there. As a matter of fact, it wasn't anything like I suspected.
Q. Could the men see you?
A. Yes, they could.
Q. Were you all in the same room?
A. Yes, sir.
Q. Were they up on a stage or anything like that?
A. No.
Q. All on the same level?
A. Yes, sir."

On the morning of the preliminary hearing on January

7, Miss Bennett was called into a conference with Assistant State's Attorney John King and Lt. Miles R. Daniels to discuss all aspects of the case by way of familiarizing Mr. King with the facts and preparing him for the hearing. Neither the Assistant State's Attorney nor the police lieutenant showed the photograph to Miss Bennett. She volunteered to the Assistant State's Attorney that she believed she could at that point make an identification of her assailant. The lieutenant then indicated to the Assistant State's Attorney that he had a photograph in the file taken of the lineup. Miss Bennett was then shown the photograph and she identified the appellant as one of her assailants. Both Lt. Daniels and Miss Bennett testified that no suggestion of any sort was made to her by either Lt. Daniels himself or Assistant State's Attorney King or anyone else.

It is clear that a viewing of photographs by a witness is not rendered illegal by the absence of counsel for the accused as there is no constitutional requirement that counsel be then present. *Simmons v. United States,* 390 U. S. 377; *Barnes v. State,* 5 Md. App. 144. The appellant, furthermore, has explicitly indicated in oral argument that he is making no claim under his Sixth Amendment right to counsel. It is simply required of a photographic identification that the procedure be not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States, supra,* at 384. The testimony was clear that no suggestions of any sort were made and that the viewing itself, indeed, was at the initiation of the victim. That the number and appearance of the individuals in the photographic viewing was adequate speaks for itself, since it was a photographic reproduction of a lineup which the appellant concedes was fair. After properly raising the challenge to the evidence, the burden was on the appellant to show, *prima facie,* that the photographic viewing was illegal, *i.e.,* that it was impermissibly suggestive. *Smith and Samuels v. State,* 6 Md. App. 59, 68. We cannot say that either Judge Shook or Judge Shearin

was wrong in concluding that the appellant did not meet that burden.

Even were our holding different on that point, however, we feel, in any event, that the evidence was ample for the trial court to determine that the in-court identification of the appellant by Miss Bennett was not come at by exploitation of the illegal photographic viewing, assuming, *arguendo*, that it had been illegal, but by means sufficiently distinguishable to be purged of the primary taint. *Joyner v. State*, 7 Md. App. 692, 703. Miss Bennett's having been in very close and even intimate contact with the appellant for a period of approximately two hours would be clear and convincing evidence of this. Her failure to make a positive identification at the December 17 lineup, rehabilitated by her accurate description of her assailant and explained by her extremely nervous condition at the time of the lineup, would go only to the weight of her in-court identification.

*Judgments affirmed.*